# WHITE MOTOR CO. *v.* UNITED STATES.

No. 54.   Argued January 14–15, 1963.—Decided March 4, 1963.

*Gerhard A. Gesell* argued the cause for appellant. With him on the briefs were *Rufus S. Day, Jr.* and *Nestor S. Foley*.

*Solicitor General Cox* argued the cause for the United States. With him on the brief were *Assistant Attorney General Loevinger* and *Robert B. Hummel*.

Briefs of *amici curiae* were filed by *Sigmund Timberg* for Serta Associates, Inc., et al., and by *John Bodner, Jr.* for the Sandura Company.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This is a civil suit under the antitrust laws that was decided below on a motion for summary judgment. Rule 56 of the Rules of Civil Procedure at the time of the hearing below permitted summary judgment to be entered "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Since that time, an amendment to Rule 56, which is included in proposed changes submitted to Congress pursuant to 28 U. S. C. § 2072, would add the following requirement:

> "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

But no such requirement was present when the present case was decided; and appellant, though strenuously opposing summary judgment and demanding a trial, submitted no such affidavits. It did, however, in its brief in

opposition to the motion for summary judgment, make allegations concerning factual matters which the District Court thought were properly raised and which we think were relevant to a decision on the merits.

Appellant manufactures trucks and sells them (and parts) to distributors,[1] to dealers, and to various large users. Both the distributors and dealers sell trucks (and parts) to users. Moreover, some distributors resell trucks (and parts) to dealers, selected with appellant's consent. All of the dealers sell trucks (and parts) only to users. The principal practices charged as violations of §§ 1 and 3 of the Sherman Act, 26 Stat. 209, 15 U. S. C. §§ 1, 3, concern limitations or restrictions on the territories within which distributors or dealers may sell and limitations or restrictions on the persons or classes of persons to whom they may sell. Typical of the *territorial clause* is the following:

> "Distributor is hereby granted the exclusive right, except as hereinafter provided, to sell during the life of this agreement, in the territory described below, White and Autocar trucks purchased from Company hereunder.
>
> "STATE OF CALIFORNIA: Territory to consist of all of Sonoma County, south of a line starting at the western boundary, or Pacific Coast, passing through the City of Bodega, and extending due east to the east boundary line of Sonoma County, with the exception of the sale of fire truck chassis to the State of California and all political subdivisions thereof.
>
> "Distributor agrees to develop the aforementioned territory to the satisfaction of Company, and not to

---

[1] We are advised by appellant that since the judgment below, White "no longer uses distributors as a separate tier in its system, but sells directly to dealers instead."

sell any trucks purchased hereunder except in accordance with this agreement, and not to sell such trucks except to individuals, firms, or corporations having a place of business and/or purchasing headquarters in said territory."

Typical of the *customer clause* is the following:

"Distributor further agrees not to sell nor to authorize his dealers to sell such trucks to any Federal or State government or any department or political subdivision thereof, unless the right to do so is specifically granted by Company in writing."

These provisions, applicable to distributors and dealers alike, are claimed by appellee to be *per se* violations of the Sherman Act.[2]   The District Court adopted that view and granted summary judgment accordingly.   194 F. Supp. 562.   We noted probable jurisdiction.   369 U. S. 858.   See 15 U. S. C. § 29.

Appellant, in arguing for a trial of the case on the merits, made the following representations to the District Court: the territorial clauses are necessary in order for appellant to compete with those who make other competitory kinds of trucks; appellant could theoretically have its own retail outlets throughout the country and sell to users directly; that method, however, is not feasible as it entails a costly and extensive sales organization; the only feasible method is the distributor or dealer system; for that system to be effective against the existing competition of the larger companies, a distributor or dealer must make vigorous and intensive efforts in a restricted territory, and if he is to be held responsible for energetic performance, it is fair, reasonable, and necessary that appellant protect him against invasions of his territory by other distributors or dealers of appellant; that appellant in order to obtain

---

[2] Appellant does not appeal from the District Court's ruling that the provisions of the contracts fixing resale prices were unlawful.

maximum sales in a given area must insist that its distributors and dealers concentrate on trying to take sales away from other competing truck manufacturers rather than from each other. Appellant went on to say:

> "The plain fact is, as we expect to be able to show to the satisfaction of the Court at a trial of this case on the merits, that the outlawing of exclusive distributorships and dealerships in specified territories would reduce competition in the sale of motor trucks and not foster such competition."

As to the customer clauses, appellant represented to the District Court that one of their purposes was to assure appellant "that 'national accounts,' 'fleet accounts' and Federal and State governments and departments and political subdivisions thereof, which are classes of customers with respect to which the defendant is in especially severe competition with the manufacturers of other makes of trucks and which are likely to have a continuing volume of orders to place, shall not be deprived of their appropriate discounts on their purchases of repair parts and accessories from any distributor or dealer, with the result of becoming discontented with The White Motor Company and the treatment they receive with reference to the prices of repair parts and accessories for White trucks."

The agreements fixing prices of parts and accessories to these customers[3] were, according to appellant, only an adjunct to the customer restriction clauses and amounted merely to an agreement to give these classes of customers their proper discounts. "In a way this affects the prices which these classes of customers have to pay for such parts and accessories, but it affects, as a practical matter, only spare and repair parts and accessories and it affects only the discounts to be given to these particular classes of customers. The provisions are necessary if the defendant's

---

[3] See note 2, *supra*.

future sales to 'National Accounts,' 'Fleet Accounts' and Federal and State governments and departments and political subdivisions thereof, in competition with other truck manufacturers, are not to be seriously jeopardized."

White also argued below:

"On principle, there is no reason whatsoever why a manufacturer should not have one distributor who is limited to selling to one class of customers and another distributor who is limited to selling to another class of customers or why a distributor should not be limited to one class of customers and the manufacturer reserve the right to sell to another class of customers. There are many circumstances under which there could be no possible objection to limiting the class of customers to which distributors or dealers resell goods, and there are many reasons why it would be reasonable and for the public interest that distributors or dealers should be limited to reselling to certain classes of customers.

"In the instant case, it is both reasonable and necessary that the distributors (except for sales to approved dealers) and direct dealers and dealers be limited to selling to the purchasing public, in order that they may be compelled to develop properly the full potential of sales of White trucks in their respective territories, and to assure The White Motor Company that the persons selling White trucks to the purchasing public shall be fair and honest, to the end of increasing and perpetuating sales of White trucks in competition with other makes of trucks; and it is reasonable and necessary that The White Motor Company reserve to itself the exclusive right to sell White trucks to Federal and State governments or any department or political subdivision thereof rather than to sell such trucks to such governments or

departments or political subdivisions thereof through distributors or dealers, and The White Motor Company should have a perfect right so to do.

"Therefore, based both on the decisions of the Federal Courts and on principle, the limitations on the classes of customers to whom distributors or dealers may sell White trucks are not only not illegal per se, as the plaintiff must prove to succeed on its motion for summary judgment, but these limitations have proper purposes and effects and are fair and reasonable and not violative of the antitrust laws as being in unreasonable restraint of competition or trade and commerce."

In this Court appellant defends the customer clauses on the ground that "the only sure way to make certain that something really important is done right, is to do it for oneself. The size of the orders, the technicalities of bidding and delivery, and other factors all play a part in this decision."

Summary judgments have a place in the antitrust field, as elsewhere, though, as we warned in *Poller* v. *Columbia Broadcasting System,* 368 U. S. 464, 473, they are not appropriate "where motive and intent play leading roles." Some of the law in this area is so well developed that where, as here, the gist of the case turns on documentary evidence, the rule at times can be divined without a trial.

Where the sale of an unpatented product is tied to a patented article, that is a *per se* violation since it is a bald effort to enlarge the monopoly of the patent beyond its terms. *Mercoid Corp.* v. *Honeywell Co.,* 320 U. S. 680, 684; *International Salt Co.* v. *United States,* 332 U. S. 392, 395–396. And see *Ethyl Gasoline Corp.* v. *United States,* 309 U. S. 436. If competitors agree to divide markets, they run afoul of the antitrust laws. *Timken Roller Bearing Co.* v. *United States,* 341 U. S. 593. Group boy-

cotts are another example of a *per se* violation. *Fashion Originators' Guild* v. *Federal Trade Comm'n,* 312 U. S. 457; *Klor's* v. *Broadway-Hale Stores,* 359 U. S. 207. Price-fixing arrangements, both vertical (*United States* v. *Parke, Davis & Co.,* 362 U. S. 29; *Dr. Miles Medical Co.* v. *Park & Sons,* 220 U. S. 373) and horizontal (*United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150; *Kiefer-Stewart Co.* v. *Seagram & Sons,* 340 U. S. 211), have also been held to be *per se* violations of the antitrust laws; and a trial to show their nature, extent, and degree is no longer necessary.

As already stated, there was price fixing here and that part of the injunction issued by the District Court is not now challenged. In any price-fixing case restrictive practices ancillary to the price-fixing scheme are also quite properly restrained. Such was *United States* v. *Bausch & Lomb Co.,* 321 U. S. 707, where price fixing was "an integral part of the whole distribution system" (*id.,* 720) including customer restrictions. No such finding was made in this case; and whether or not the facts would permit one we do not stop to inquire.

Appellant apparently maintained two types of price-fixing agreements. Under the first, a distributor was allowed to appoint dealers under him, but each distributor had to agree with appellant that he would charge the dealers the same price for trucks that appellant charged its direct dealers. The agreement affected only five percent of the trucks sold by appellant. And there were no price-fixing provisions pertaining to truck sales to ultimate purchasers. The other price-fixing arrangement required all distributors and dealers to give "national accounts," "fleet accounts," and governmental agencies the same discount on parts and accessories as White gave them. No figures are given, but it was assumed by the District Court that the amount of commerce involved under this agreement was relatively small. Without more

detailed findings we therefore cannot say that the case is governed by *United States* v. *Bausch & Lomb Co., supra.*

We are asked to extend the holding in *Timken Roller Bearing Co.* v. *United States, supra* (which banned *horizontal* arrangements among competitors to divide territory), to a *vertical* arrangement by one manufacturer restricting the territory of his distributors or dealers. We intimate no view one way or the other on the legality of such an arrangement, for we believe that the applicable rule of law should be designed after a trial.

This is the first case involving a territorial restriction in a *vertical* arrangement; and we know too little of the actual impact of both that restriction and the one respecting customers to reach a conclusion on the bare bones of the documentary evidence before us.

*Standard Oil Co.* v. *United States,* 221 U. S. 1, 62, read into the Sherman Act the "rule of reason." That "rule of reason" normally requires an ascertainment of the facts peculiar to the particular business. As stated in *Chicago Board of Trade* v. *United States,* 246 U. S. 231, 238:

> "Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention

will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences."

We recently reviewed *per se* violations of the antitrust laws in *Northern Pac. R. Co.* v. *United States,* 356 U. S. 1. That category of antitrust violations is made up of "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Id.,* p. 5. Tying arrangements or agreements by a party "to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier" (*id.,* pp. 5–6) may fall in that category, though not necessarily so.

> "They are unreasonable in and of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce is affected. . . . Of course where the seller has no control or dominance over the tying product so that it does not represent an effectual weapon to pressure buyers into taking the tied item any restraint of trade attributable to such tying arrangements would obviously be insignificant at most. As a simple example, if one of a dozen food stores in a community were to refuse to sell flour unless the buyer also took sugar it would hardly tend to restrain competition in sugar if its competitors were ready and able to sell flour by itself." *Id.,* pp. 6–7.

We recently noted the importance of the nature of the tying arrangement in its factual setting:

"Thus, unless the tying device is employed by a small company in an attempt to break into a market, cf. *Harley-Davidson Motor Co.,* 50 F. T. C. 1047, 1066, the use of a tying device can rarely be harmonized with the strictures of the antitrust laws, which are intended primarily to preserve and stimulate competition." *Brown Shoe Co.* v. *United States,* 370 U. S. 294, 330.

Horizontal territorial limitations, like "[g]roup boycotts, or concerted refusals by traders to deal with other traders" (*Klor's* v. *Broadway-Hale Stores, supra,* 212), are naked restraints of trade with no purpose except stifling of competition. A vertical territorial limitation may or may not have that purpose or effect. We do not know enough of the economic and business stuff out of which these arrangements emerge to be certain. They may be too dangerous to sanction or they may be allowable protections against aggressive competitors or the only practicable means a small company has for breaking into or staying in business (cf. *Brown Shoe, supra,* at 330; *United States* v. *Jerrold Electronics Corp.,* 187 F. Supp. 545, 560–561, aff'd, 365 U. S. 567) and within the "rule of reason." We need to know more than we do about the actual impact of these arrangements on competition to decide whether they have such a "pernicious effect on competition and lack . . . any redeeming virtue" (*Northern Pac. R. Co.* v. *United States, supra,* p. 5) and therefore should be classified as *per se* violations of the Sherman Act.

There is an analogy from the merger field that leads us to conclude that a trial should be had. A merger that would otherwise offend the antitrust laws because of a

substantial lessening of competition has been given immunity where the acquired company was a failing one. See *International Shoe Co.* v. *Commission,* 280 U. S. 291, 302–303. But in such a case, as in cases involving the question whether a particular merger will tend "substantially to lessen competition" (*Brown Shoe Co.* v. *United States, supra,* pp. 328–329), a trial rather than the use of the summary judgment is normally necessary. *United States* v. *Diebold, Inc.,* 369 U. S. 654.

We conclude that the summary judgment, apart from the price-fixing phase of the case, was improperly employed in this suit. Apart from price fixing, we do not intimate any view on the merits. We only hold that the legality of the territorial and customer limitations should be determined only after a trial.

*Reversed.*

MR. JUSTICE WHITE took no part in the consideration or decision of this case.

MR. JUSTICE BRENNAN, concurring.

While I join the opinion of the Court, the novelty of the antitrust questions prompts me to add a few words. I fully agree that it would be premature to declare either the territorial or the customer restrictions illegal *per se,* since "we know too little of the actual impact [of either form of restraint] . . . to reach a conclusion on the bare bones of the . . . evidence before us." But it seems to me that distinct problems are raised by the two types of restrictions and that the District Court will wish to have this distinction in mind at the trial.

I.

I discuss first the territorial limitations. The insulation of a dealer or distributor through territorial restraints against sales by neighboring dealers who would otherwise

be his competitors involves a form of restraint upon alienation, which is therefore historically and inherently suspect under the antitrust laws.[1] See *Dr. Miles Medical Co.* v. *John D. Park & Sons Co.,* 220 U. S. 373, 404–408. That proposition does not, however, tell us that every form of such restraint is utterly without justification and is therefore to be deemed unlawful *per se.* That is true only of those "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pac. R. Co.* v. *United States,* 356 U. S. 1, 5. Specifically, the *per se* rule of prohibition has been applied to price-fixing agreements, group boycotts, tying arrangements, and horizontal divisions of markets. As to each of these practices, experience and analysis have established the utter lack of justification to excuse its inherent threat to competition.[2] To gauge the appropriateness of a *per se* test for the forms of restraint involved in this case, then, we must determine whether experience warrants, at this stage, a conclusion that inquiry into effect upon competition and economic justi-

[1] For a general consideration of the history and legality of restraints upon alienation, both at common law and under the Sherman Act, see Levi, The Parke, Davis-Colgate Doctrine: The Ban on Resale Price Maintenance, Supreme Court Review (Kurland ed. 1960), 258, 270–278.

[2] The general principle which the Court has stated with respect to price-fixing agreements is applicable alike to boycotts, divisions of markets, and tying arrangements: "Whatever economic justification particular . . . agreements may be thought to have, the law does not permit an inquiry into their reasonableness. They are all banned because of their actual or potential threat to the central nervous system of the economy." *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, 224, n. 59, at 226.

fication would be similarly irrelevant.[3]   With respect to the territorial limitations of the type at bar, I agree that the courts have as yet been shown no sufficient experience to warrant such a conclusion.

The Government urges, and the District Court found, that these restrictions so closely resemble two traditionally outlawed forms of restraint—horizontal market division and resale price maintenance—that they ought to be governed by the same absolute legal test.   Both analogies are surely instructive, and all the more so because the practices at bar are *sui generis;* but both are, at the same time, misleading.   It seems to me that consideration of the similarities has thus far obscured consideration of the equally important differences, which serve in my

---

[3] Outside the categories of restraint which are *per se* unlawful, this Court has said that the question to be answered is "whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition.   To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts." *Chicago Board of Trade* v. *United States,* 246 U. S. 231, 238.

While the Government urges upon us the adoption of a *per se* rule of illegality, it nonetheless recognizes that not all the considerations relevant to the validity of this particular form of restraint are or could be presented by the present case: "What is the importance of *interbrand* as opposed to *intrabrand* competition?  . . . Will White's restrictions remain reasonable if its share of the market increases?  . . . These are only a few of the issues relevant to a trial of the 'reasonableness' of any particular set of territorial restrictions.   Nor could one be content with a single investigation.   Business conditions change.   The effect of restricting competition among dealers today may be different tomorrow."   Brief for the United States, pp. 31–32.

view to distinguish the practice here from others as to which we have held a *per se* test clearly appropriate.

Territorial limitations bear at least a superficial resemblance to horizontal divisions of markets among competitors, which we have held to be tantamount to agreements not to compete, and hence inevitably violative of the Sherman Act,[4] *Timken Roller Bearing Co.* v. *United States,* 341 U. S. 593. If it were clear that the territorial restrictions involved in this case had been induced solely or even primarily by appellant's dealers and distributors, it would make no difference to their legality that the restrictions were formally imposed by the manufacturer rather than through inter-dealer agreement.[5] Cf. *Interstate Circuit, Inc.,* v. *United States,* 306 U. S. 208; *United States* v. *Masonite Corp.,* 316 U. S. 265, 275–276. But for aught that the present record discloses, an equally plausible inference is that the territorial restraints were imposed upon unwilling distributors by the manufacturer to serve exclusively his own interests. That inference gains some credibility from the fact that these limitations—unlike, for example, exclusive franchise agreements—bind the dealers to a rather harsh bargain while leaving the manufacturer unfettered. In any event, neither the source nor the purpose of these restraints can be conclusively determined on the pleadings or the supporting affidavits. The crucial question whether, despite the differences in form, these restraints serve the same pernicious purpose and have the same

---

[4] See *Addyston Pipe & Steel Co.* v. *United States,* 175 U. S. 211, 240–245; *United States* v. *National Lead Co.,* 63 F. Supp. 513, aff'd, 332 U. S. 319. See also Report of the Attorney General's National Committee to Study the Antitrust Laws (1955), 26.

[5] For contrasting views on this question, compare Kessler and Stern, Competition, Contract, and Vertical Integration, 69 Yale L. J. 1, 113 (1959), with Robinson, Restraints on Trade and the Orderly Marketing of Goods, 45 Cornell L. Q. 254, 267–268 (1960).

inhibitory effects upon competition as horizontal divisions of markets, is one which cannot be answered without a trial.[6]

The analogy to resale price maintenance agreements is also appealing, but is no less deceptive. Resale price maintenance is not only designed to, but almost invariably does in fact, reduce price competition not only *among* sellers of the affected product, but quite as much *between* that product and competing brands. See *United States v. Parke, Davis & Co.*, 362 U. S. 29, 45–47. While territorial restrictions may indirectly have a similar effect upon *intra*-brand competition, the effect upon *inter*-brand competition is not necessarily the same as that of resale price maintenance.[7]

Indeed, the principal justification which the appellant offers for the use of these limitations is that they foster a vigorous inter-brand competition which might otherwise be absent. Thus, in order to determine the lawfulness of this form of restraint, it becomes necessary to assess the merit of this and other extenuations offered by the appellant. Surely it would be significant to the disposition of

---

[6] See, for an elaboration and discussion of some of the factors which might enter such an inquiry, *Snap-On Tools Corp.*, FTC Docket 7116, 3 CCH Trade Reg. Rep. ¶ 15,546; Jordan, Exclusive and Restricted Sales Areas Under the Antitrust Laws, 9 U. C. L. A. L. Rev. 111, 125–129 (1962). For further discussion of the reasons which make such an inquiry desirable with respect to restraints of this very kind, see Turner, The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal, 75 Harv. L. Rev. 655, 698–699 (1962).

[7] See Note, Restricted Channels of Distribution Under the Sherman Act, 75 Harv. L. Rev. 795, 800–801 (1962). It may be relevant to the question whether the territorial restrictions were intended to suppress price competition that appellant also maintained a schedule of resale prices in its distributor agreements, though there has been no challenge here to the District Court's finding that those provisions were unlawful *per se*.

this case if, as appellant claims, some such arrangement were a prerequisite for effective competition on the part of independent manufacturers of trucks. Whatever relationship such restraints may bear to the ultimate survival of producers like White should be fully explored by the District Court if we are properly to appraise this excuse for resort to these practices.

There are other situations, not presented directly by this case, in which the possibility of justification cautions against a too hasty conclusion that territorial limitations are invariably unlawful. Arguments have been suggested against that conclusion, for example, in the case of a manufacturer starting out in business or marketing a new and risky product; the suggestion is that such a manufacturer may find it essential, simply in order to acquire and retain outlets, to guarantee his distributors some degree of territorial insulation as well as exclusive franchises. It has also been suggested that it may reasonably appear necessary for a manufacturer to subdivide his sales territory in order to ensure that his product will be adequately advertised, promoted, and serviced.[8] It is, I think, the

---

[8] For situations in which such extenuations might be relevant, compare, e. g., *Packard Motor Car Co.* v. *Webster Motor Car Co.*, 100 U. S. App. D. C. 161, 243 F. 2d 418; *Schwing Motor Co.* v. *Hudson Sales Corp.*, 138 F. Supp. 899 (D. C. D. Md.), aff'd, 239 F. 2d 176 (C. A. 4th Cir.). In the former case the court observed, in holding an exclusive franchise arrangement not violative of the Sherman Act:

"The short of it is that a relatively small manufacturer, competing with large manufacturers, thought it advantageous to retain its largest dealer in Baltimore, and could not do so without agreeing to drop its other Baltimore dealers. To penalize the small manufacturer for competing in this way not only fails to promote the policy of the antitrust laws but defeats it." 100 U. S. App. D. C., at 164, 243 F. 2d, at 421. The doctrine of the *Packard* and *Schwing* cases is, however, of necessarily limited scope; not only were the manufacturers involved much smaller than the "big three" of the automobile industry against whom they competed, but both had

inappropriateness or irrelevance of such justifications as these to the practices traditionally condemned under the *per se* test that principally distinguishes the territorial restraints involved in the present case from horizontal market divisions and resale price maintenance.

Another issue which seems to me particularly to require a full inquiry into the pros and cons of these territorial restrictions is whether, assuming that some justification for these limitations can be shown, their operation is reasonably related to the needs which brought them into being. To put the question another way, the problem is not simply whether some justification can be found, but whether the restraint so justified is more restrictive than necessary, or excessively anticompetitive, when viewed in light of the extenuating interests.[9] That question is one which can be adequately treated only by examining the operation and practical effect of the restraints, whatever may be their form. And in order to appraise that effect, it is necessary to know what sanctions are imposed against distributors who "raid," or sell across territorial boundaries in violation of the agreements. If, for example, such a cross-sale incurs only an obligation to share (or "pass over") the profit with the dealer whose territory has been invaded—as is most often, and appar-

---

experienced declines in their respective market shares. And the exclusive franchises involved in those cases apparently were not accompanied by territorial limitations. See Jordan, *supra,* note 6, at 135–139. See, for consideration of a similar problem by the Federal Trade Commission, *Columbus Coated Fabrics Corp.,* 55 F. T. C. 1500, 1503–1504.

[9] If the restraint is shown to be excessive for the manufacturer's needs, then its presence invites suspicion either that dealer pressures rather than manufacturer interests brought it about, or that the real purpose of its adoption was to restrict price competition, cf. *Ethyl Gasoline Corp.* v. *United States,* 309 U. S. 436, 457–459; *United States* v. *Masonite Corp., supra.* See Turner, *supra,* note 6, at 698–699, 704–705.

ently here, the case [10]—then the practical effect upon competition of a territorial limitation may be no more harmful than that of the typical exclusive franchise—the lawfulness of which the Government does not dispute here. If, on the other hand, the dealer who cross-sells runs the risk under the agreement of losing his franchise altogether, intra-brand competition across territorial boundaries involves serious hazards which might well deter any effort to compete.

Another pertinent inquiry would explore the availability of less restrictive alternatives. In the present case, for example, as the Government suggests, it may appear at the trial that whatever legitimate business needs White advances for territorial limitations could be adequately served, with less damage to competition, through other devices—for example, an exclusive franchise,[11] an assignment of areas of primary responsibility to each distributor,[12] or a revision of the levels of profit pass-over so

---

[10] In its complaint, the Government charged that any dealer or distributor who sells in another's reserved territory must pay to the injured distributor "a specified amount of money for violation of said exclusive territory . . . ." There has been no suggestion in this case that more drastic sanctions, such as withdrawal or cancellation of a franchise, have ever been invoked by the appellant to check cross-selling. The pass-over provisions contained in the typical White contract (in a provision governing "adjustment on outside deliveries") seem representative of exclusive-territory sanctions generally employed. See Note, Restricted Channels of Distribution Under the Sherman Act, 75 Harv. L. Rev. 795, 814–816 (1962).

[11] The District Court suggested, 194 F. Supp., at 585–586, and the Government seems to concede, that certain types of exclusive franchises would not violate the Sherman Act, although a determination of the legality of such arrangements would seem also to require an examination of their operation and effect.

[12] See *Snap-On Tools Corp.*, FTC Docket No. 7116, 3 CCH Trade Reg. Rep. ¶ 15,546, p. 20,414. A number of consent decrees have recently recognized the lawfulness of area-of-primary-responsibility covenants as substitutes for the more restrictive exclusive arrange-

as to minimize the deterrence to cross-selling by neighboring dealers where competition is feasible.[13]  But no such inquiry as this into the question of alternatives could meaningfully be undertaken until the District Court has ascertained the effect upon competition of the particular territorial restraints in suit, and of the particular sanctions by which they are enforced.

## II.

I turn next to the customer restrictions.  These present a problem quite distinct from that of the territorial limitations.  The customer restraints would seem inherently the more dangerous of the two, for they serve to suppress all competition between manufacturer and distributors for the custom of the most desirable accounts.  At the same time they seem to lack any of the countervailing tendencies to foster competition between brands which may accompany the territorial limitations.  In short, there is far more difficulty in supposing that such customer restrictions can be justified.

The crucial question to me is whether, in any meaningful sense, the distributors could, but for the restrictions,

---

ments.  See, e. g., United States v. Bostitch, Inc., CCH 1958 Trade Cases ¶ 69,207 (D. C. D. R. I.) ; United States v. Rudolph Wurlitzer Co., CCH 1958 Trade Cases ¶ 69,011 (D. C. W. D. N. Y.).  The thrust of such provisions is, however, only that the dealer must adequately represent the manufacturer in the assigned area, not that he must stay out of other areas.  See generally 60 Mich. L. Rev. 1008 (1962).

[13] The essential question whether such restraints exceed the appellant's competitive needs cannot be answered, as the Government suggests, simply by reference to the views of major automobile manufacturers that territorial limitations are unnecessary to ensure effective promotion and servicing for their products.  See Hearings Before a Subcommittee of the House Committee on Interstate and Foreign Commerce on Automobile Marketing Legislation, 84th Cong., pp. 160, 248, 285, 323.

compete with the manufacturer for the reserved outlets.[14] If they could, but are prevented from doing so only by the restrictions, then in the absence of some justification neither presented nor suggested by this record, their invalidity would seem to be apparent. Cf. *United States v. McKesson & Robbins, Inc.*, 351 U. S. 305, 312; *United States* v. *Klearflax Linen Looms, Inc.*, 63 F. Supp. 32. If, on the other hand, it turns out that as a practical matter the restricted dealers could neither fill the orders nor service the fleets of the governmental and fleet customers, then the District Court might conclude that because there would otherwise be no meaningful competition, the restrictive agreements do no more than codify the economically obvious. It might even be that such restrictions were originally designed to foreclose the distributors from soliciting the reserved accounts, but that now the restrictions have become meaningless because the distributors would in any event be unable to compete.

The reasons given by White for the use of customer restrictions strike me as untenable if in operation and effect the restrictions are found to stifle competition. These justifications are of three types. First, White argues that such restrictions are required because "[a] distributor or dealer is not competent to handle this intricate process [of servicing large accounts] until he has had

---

[14] In an analogous case, brought under § 5 of the Federal Trade Commission Act, the Commission dismissed the complaint because of insufficient evidence that customer limitations had foreclosed meaningful competition. *In the Matter of Roux Distributing Co.*, 55 F. T. C. 1386. The finding that non-contractual customer restrictions had a clearly anticompetitive effect in *United States* v. *Klearflax Linen Looms, Inc.*, 63 F. Supp. 32, was one which could seemingly not have been made without a trial on the merits, even though the manufacturer involved held a position of virtual monopoly. See Note, Restricted Channels of Distribution Under the Sherman Act, 75 Harv. L. Rev. 795, 817–818 (1962).

many months of specialized White training"; and that there is a consequent danger of "unauthorized dealers" who "will be unqualified to work out specifications for trucks to meet customers' peculiar requirements." To the extent that these fears are well founded, they represent the concerns which any manufacturer may legitimately have about his distributors' ability to deal effectively with large or demanding customers. By their very terms, however, these concerns seem to call not for cutting the distributors completely out of this segment of the market, but rather for such less drastic measures as, for example, improved supervision and training, or perhaps a special form of manufacturer's warranty to the governmental and fleet purchasers to protect against unsatisfactory distributor servicing.

The second justification White offers is that "the only sure way to make certain that something really important is done right, is to do it for oneself." This argument seems to me to prove too much, for if the distributors truly cannot be counted on to solicit and service the governmental and fleet accounts—not all of which are, in fact, large or demanding—then this suggests that the only adequate solution may be vertical integration, the elimination of all independent or franchised distribution. But that White is either unwilling or unable to do. Instead, it seeks the best of both worlds—to retain a distribution system for the general run of its customers, while skimming off the cream of the trade for its own direct sales. That, it seems to me, the antitrust laws would not permit, cf. *Eastman Kodak Co.* v. *Southern Photo Materials Co.*, 273 U. S. 359, 375, if in fact the distributors could compete for the reserved accounts without the restrictions.

The third justification, which White offered in its jurisdictional statement, is that customer limitations are essential to enable it to "more effectively compete against its competitors by selling trucks directly" to the reserved

customers rather than "through the interposition of distributors or dealers." This argument invites consideration of what to me is the essential vice of the customer restrictions. The manufacturer's very position in the channels of distribution should afford him an inherent cost advantage over his distributors. In the nature of things, it would seem that the large purchasers would buy from whichever outlet gave them the lowest prices. Thus, if the manufacturer always did grant discounts which the distributors were unable to grant, there would seem to be no reason whatever for denying the distributors able to overcome that advantage access to the preferred customers. Conversely, the presence of such restrictions in the agreements between White and its distributors suggests that they are designed, at least in part, to protect a noncompetitive pricing structure, in which the manufacturer in fact does *not* always charge the lowest prices.

In sum, the proffered justifications do not seem to me to sanction customer restrictions which suppress all competition between the manufacturer and his distributors for the most desirable customers. On trial, as I see it, the Government will necessarily prevail unless the proof warrants a finding that, even in the absence of the restrictions, the economics of the trade are such that the distributors cannot compete for the reserved accounts.

MR. JUSTICE CLARK, with whom THE CHIEF JUSTICE and MR. JUSTICE BLACK join, dissenting.

The Court is reluctant to declare vertical territorial arrangements illegal *per se* because "This is the first case involving a territorial restriction in a *vertical* arrangement; and we know too little of the actual impact . . . of that restriction . . . to reach a conclusion on the bare bones of the documentary evidence before us." The "bare bones" consist of the complaint and answer, excerpts from interrogatories, exhibits and deposition of the secretary

of White Motor on behalf of the Government, taken in 1959, the formal motion of the Government for summary judgment and an excerpt entitled "Argument" from the brief of White Motor in opposition thereto. I believe that these "bare bones" really lay bare one of the most brazen violations of the Sherman Act that I have experienced in a quarter of a century.

This "argument," which the appellant has convinced the Court raises a factual issue requiring a trial, points out that each distributor is required to maintain a sales room, service station and a representative number of White trucks. "In return for these agreements of the distributor . . . it is only fair and reasonable and, in fact, necessary . . . that the distributor shall be protected in said distributor's territory against selling therein by defendant's other distributors . . . who have not made the investment of money and effort . . . in the said territory." Likewise, appellant's argument continues, "similar provisions in direct dealers' contracts and in contracts between the distributors and their respective dealers have the same purposes and the same effects." These limitations have "the purpose and effect of promoting the business and increasing the sales of White trucks in competition with The White Motor Company's powerful competitors." Emphasizing that the motor-truck manufacturing industry is one of "the most highly competitive industries in this country," appellant points up that its share "is very small" and "by no stretch of the imagination, could be said to dominate the market in trucks." It insists that there are but two ways to market trucks: (1) selling to the public through its own sales and service stations, and (2) through the distributor-dealer distribution system which it presently follows. It discards the first as being "feasible only for a very large company." As to the second, the distributors and dealers must not be allowed to spread their efforts "too thinly over more territory

than they can vigorously and intensively work." It is therefore necessary, appellant says, "to confine their efforts to a territory no larger than they have the financial means and sales and service facilities and capabilities to intensively cultivate . . . ." In return "it is only fair and reasonable, and indeed necessary, that The White Motor Company protect its dealers and distributors in their respective allotted territories against the exploitation by other White distributors or dealers, and indeed by the Company itself . . . ." In order to procure "distributors and dealers that will adequately represent The White Motor Company's line of motor trucks, [it] has to agree that these men shall be exclusive sales representatives in a given territory." For this reason appellant "will not allow any other of its distributors or dealers to come into the territory and scalp the market for White trucks therein." Rather than "cutting each other's throats" White Motor insists that they "concentrate on trying to take sales away from other competing truck manufacturers . . . ." The net effect of its justification for the territorial allocation is that "these limitations have proper purposes and effects and are fair and reasonable . . . ." (Italicized in original.)

On the price-fixing requirement in the contracts, which White Motor has abandoned on appeal, the "argument" points out that this requirement was limited to about 5% of its sales and was not followed in sales to the public. Justification for its use otherwise was that it insured that all of its agents "get an equal break pricewise," which was a necessary step to having "satisfied and efficient dealer organizations." As to the required discounts provision on repair parts and accessories, it says that these are necessary "if the defendant's future sales to 'National Accounts,' 'Fleet Accounts' and Federal and State governments . . . and political subdivisions . . . are not to be seriously jeopardized." After all, it says, "probably

nothing will make the owner of a motor vehicle so peeved as to be overcharged for repair parts and accessories."

The situation in which White Motor finds itself may be summed up in its own words, *i. e.,* that its contracts are "the only feasible way for [it] to compete effectively with its bigger and more powerful competitors . . . ." In this justification it attempts but to make a virtue of business necessity, which has long been rejected as a defense in such cases. See *Dr. Miles Medical Co.* v. *John D. Park & Sons Co.,* 220 U. S. 373, 407–408 (1911); *Fashion Originators' Guild* v. *Federal Trade Comm'n,* 312 U. S. 457, 467–468 (1941), and *Northern Pac. R. Co.* v. *United States,* 356 U. S. 1, 5 (1958). This is true because the purpose of these provisions in its contracts as shown by White Motor's own "argument" is to enable it to compete with its "powerful competitors" and "protect its dealers and distributors in their respective allotted territories against the exploitation by other White distributors or dealers" and thus prevent them from "cutting each other's throats." These grounds for its action may be good for White Motor but they are disastrous for free competitive enterprise and, if permitted, will destroy the effectiveness of the Sherman Act. For under these contracts a person wishing to buy a White truck must deal with only one seller who by virtue of his agreements with dealer competitors has the sole power as to the public to set prices, determine terms and even to refuse to sell to a particular customer. In the latter event the customer could not buy a White truck because a neighboring dealer must reject him under the White Motor contract unless he has "a place of business and/or purchasing headquarters" in the latter's territory. He might buy another brand of truck, it is true, but the existence of interbrand competition has never been a justification for an explicit agreement to eliminate competition. See *United States* v. *McKesson & Robbins, Inc.,* 351 U. S. 305 (1956). Like-

wise each White Motor dealer is isolated from all competition with other White Motor dealers. One cannot make a sale or purchase of a White Motor truck outside of his own territory. He is confined to his own economic island.

I have diligently searched appellant's offer of proof but fail to find any allegation by it that raises an issue of fact. All of its statements are economic arguments or business necessities none of which have any bearing on the legal issue. It clearly appears from its contracts that "all room for competition between retailers [dealers], who supply the public, is made impossible." *John D. Park & Sons Co.* v. *Hartman,* 153 F. 24, 42 (C. A. 6th Cir.), opinion by Mr. Justice Lurton, then circuit judge, and adopted by Mr. Justice Hughes, later Chief Justice, in *Dr. Miles Medical Co.* v. *John D. Park & Sons Co., supra,* at 400 (1911). I have read and re-read appellant's "argument" and even though I give it the dignity of proof I return to the conclusion, as did Mr. Justice Lurton, that "If these contracts leave any room at any point of the line for the usual play of competition between the dealers . . . it is not discoverable." *Ibid.*

This Court, it is true, has never held whether there is a difference between market divisions voluntarily undertaken by a manufacturer such as White Motor and those of dealers in a commodity, agreed upon by themselves, such as were condemned in *Timken Roller Bearing Co.* v. *United States,* 341 U. S. 593 (1951). White does not contend that its distribution system has any less tendency to restrain competition among its distributors and dealers than a horizontal agreement among such distributors and dealers themselves. It seems to place some halo around its agreements because they are vertical. But the intended and actual effect is the same as, if not even more destructive than, a price-fixing agreement or any of its *per se* counterparts. This is true because price-fixing

agreements, being more easily breached, must be continually policed by those forming the combination, while contracts for a division of territory, being easily detected, are practically self-enforcing. Moreover, White Motor has admitted that each of its distributors and dealers, numbering some 300, has entered into identical contracts. In its "argument" it says that "it has to" agree to these exclusive territorial arrangements in order to get financially able and capable distributors and dealers. It has nowise denied that it has been required by the distributors or dealers to enter into the contracts. Indeed the clear inference is to the contrary. The motivations of White Motor and its distributors and dealers are inextricably intertwined; the distributors and dealers are each acquainted with the contracts and have readily complied with their requirements, without which the contracts would be of no effect. It is hard for me to draw a distinction on the basis of who initiates such a plan. Indeed, under *Interstate Circuit, Inc.,* v. *United States,* 306 U. S. 208, 223 (1939), the unanimity of action by some 300 parties here forms the basis of an "understanding that all were to join" and the economics of the situation would certainly require as much. There this Court on a much weaker factual basis held:

> "It taxes credulity to believe that the several distributors would, in the circumstances, have accepted and put into operation with substantial unanimity such . . . methods without some understanding that all were to join, and we reject as beyond the range of probability that it was the result of mere chance."

Likewise, the other restrictions in the contracts run counter to the Sherman Act. This Court has held the restriction on the withholding of customers to be illegal as a contract between potential competitors not to compete, *United States* v. *McKesson & Robbins, Inc., supra,* at

312 (1956), and White Motor's prohibition on resales without its approval is condemned by *United States* v. *Bausch & Lomb Co.,* 321 U. S. 707, 721 (1944). Experience, as well as our cases, has shown that these restrictions have a "pernicious effect on competition and lack . . . any redeeming virtue . . . ." *Northern Pac. R. Co.* v. *United States, supra,* at 5.

The Court says that perhaps the reasonableness or the effect of such arrangements might be subject to inquiry. But the rule of reason is inapplicable to agreements made solely for the purpose of eliminating competition. *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150 (1940) (price fixing); *Fashion Originators' Guild* v. *Federal Trade Comm'n, supra* (group boycotts); *International Salt Co.* v. *United States,* 332 U. S. 392 (1947), and *United States* v. *National Lead Co.,* 332 U. S. 319 (1947) (tying arrangements); *Timken Roller Bearing Co.* v. *United States, supra; Nationwide Trailer Rental System* v. *United States,* 355 U. S. 10 (1957), affirming 156 F. Supp. 800 (D. C. D. Kan. 1957), and *United States* v. *National Lead Co., supra* (division of markets). The same rule applies to the contracts here. The offered justification must fail because it involves a contention contrary to the public policy of the Sherman Act, which is that the suppression of competition is in and of itself a public injury. To admit, as does the petitioner, that competition is eliminated under its contracts is, under our cases, to admit a violation of the Sherman Act. No justification, no matter how beneficial, can save it from that interdiction.

The thrust of appellant's contention seems to be in essence that it cannot market its trucks profitably without the advantage of the restrictive covenants. I note that other motor car manufacturers—including the "big three"—abandoned the practice over a decade ago. One of these, American Motors, told the Eighty-fourth Congress, before which legislation was pending to permit divi-

sion of territory,[1] that it was "not in favor of any legislation, permissive or otherwise, that restricts the right of the customer to choose any dealers from whom he desires to purchase." Hearings before a Subcommittee of the House Committee on Interstate and Foreign Commerce on Automobile Marketing Legislation, 84th Cong., p. 285. American Motors seems to have been able to survive and prosper against "big three" competition. But even though White Motor gains an advantage through the use of the restrictions, "the question remains whether it is one which [it] is entitled to secure by agreements restricting the freedom of trade on the part of dealers who own what they sell." *Dr. Miles Medical Co., supra,* at 407–408. And, Mr. Justice Hughes continued:

> "As to this, the complainant can fare no better with its plan of identical contracts than could the dealers themselves if they formed a combination and endeavored to establish the same restrictions, and thus to achieve the same result, by agreement with each other. If the immediate advantage they would thus obtain would not be sufficient to sustain such a direct agreement, the asserted ulterior benefit to the complainant cannot be regarded as sufficient to support its system." *Id.,* at 408.

The milk in the coconut is that White Motor "having sold its product at prices satisfactory to itself, the public is entitled to whatever advantage may be derived from competition in the subsequent traffic." *Id.,* at 409.

Today the Court does a futile act in remanding this case for trial. In my view appellant cannot plead nor prove an issue upon which a successful defense of its contracts can be predicated. Neither time (I note the case is

---

[1] H. R. 6544, 84th Cong., 1st Sess. The bill was never reported from the Committee.

now in its sixth year) nor all of the economic analysts, the statisticians, the experts in marketing, or for that matter the ingenuity of lawyers, can escape the unalterable fact that these contracts eliminate competition and under our cases are void. The net effect of the remand is therefore but to extend for perhaps an additional five years White Motor's enjoyment of the fruits of its illegal action. Certainly the decision has no precedential value [2] in substantive antitrust law.

---

[2] Our recent certification of the amendment to the summary judgment procedure under Rule 56, quoted in the Court's opinion, will eliminate the problem posed here, *i. e.*, the sufficiency of the record.