UNITED STATES of America

v.

COUNTY NATIONAL BANK OF BENNINGTON and Catamount National Bank, Defendants,

and

William B. Camp, Comptroller of the Currency, Intervenor.

Civ. A. No. 6088.

United States District Court,
D. Vermont.

July 28, 1971.

George W. F. Cook, U. S. Atty., Rutland, Vt., Bernard Wehrman and Peter W. Oldershaw, Dept. of Justice, New York City, for plaintiff.

John H. Williams, II, Williams, Witten, Carter & Dollard, Bennington, Vt., and Eugene J. Metzger, Metzger, Schwarz, McKenna & Kempler, Washington, D. C., for defendants.

Philip L. Roache, Jr., U. S. Treasury Dept., Washington, D. C., for intervenor.

## OPINION AND ORDER

LEDDY, Chief Judge.

The issue posed by defendants' and intervenor's motion for summary judgment is whether the proposed merger of the Catamount National Bank (Catamount) and the County National Bank (County National) both of Bennington County, Vermont, considered solely from an antitrust viewpoint, violates the Clayton Act standard (15 U.S.C. § 18) embodied in the Bank Merger Act of 1966. (12 U.S.C. §§ 1828(c)(5) & (7) (B)).

■ The Government filed this action on November 5, 1970, basing this suit upon 15 U.S.C. § 25 and 15 U.S.C. § 18, commonly known as Sections 15 and 7 of the Clayton Act, respectively. Since the antitrust standards traditionally applied by the Courts are embodied in the Bank Merger Act of 1966, the Government's failure to bring this action under the Bank Merger Act of 1966 does not constitute a defect in pleading nor does such failure oust the court of jurisdiction. United States v. First City National Bank, 386 U.S. 361, 363–364, 87 S.Ct. 1088, 18 L.Ed.2d 151 (1967).

■ The Court's duty under the Bank Merger Act of 1966 is twofold. First, we are required to make a *de novo* inquiry into the validity of the proposed merger to determine whether the merger offends the traditional antitrust standards imposed by the Clayton Act. Secondly, if the merger does offend these standards, we must inquire whether the merger is justified by the "convenience and needs of the community." United States v. Third National Bank, 390 U.S. 171, 178, 88 S.Ct. 882, 19 L.Ed.2d 1015 (1968); United States v. First City National Bank, *supra*.

■ The law is clear that the defendant banks, to avail themselves of the justification defense of convenience and needs, must plead this defense and have the burden of proof in this regard. Neither the intervenor, Comptroller of the Currency, nor the defendant banks herein have pleaded the convenience and needs defense, but instead, in the posture of a motion for summary judgment, have addressed themselves to the threshold question of whether the proposed merger violates the provisions of Section 7 of the Clayton Act. For the purposes of this motion for summary judgment, the intervenor and defendants have admitted all material allegations of the Government,[1] claiming that while the market chosen by the Government is the relevant geographic market, it is immune from the prohibitive provisions of Section 7 of the Clayton Act as the market area chosen by the Government is not, as a matter of law, a "section of the country" thereunder.[2]

The relevant geographic market claimed by the Government is defined as

---

1. While both the intervenor and defendant banks seek to treat the issue posed solely as a question of law, their pleadings are ambivalent in this regard. The intervenor in his answer
   denies that said "Bennington area" is a *proper area* to assess the proposed merger as it is not a "section of the country" within the meaning of Section 7 of the Clayton Act * * *. [emphasis added.]
   The defendant banks in their motion for summary judgment claim that the
   Answer filed contemporaneously with this Motion admits sufficient of Plaintiff's assertions of fact and law to require a finding by this Court that the proposed merger violates Section 7 of

the Clayton Act (15 U.S.C. § 18) *if in fact* the relevant geographic market selected by the Plaintiff is . . . of sufficient size to constitute a section of the country within the intendment of the statute. [emphasis added.]

2. The relevant portion of Section 7 of the Clayton Act (15 U.S.C. § 18) reads as follows: "No corporation engaged in commerce * * * shall acquire [the] * * assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

the "Bennington, Vermont area", including the townships of Arlington, Sunderland, Shaftsbury, Glastenbury, Bennington, Woodford, Searsburg, Pownal, Stamford, and Readsboro, located in Bennington County in the State and District of Vermont. This area comprises approximately two-thirds of Bennington County, one of fourteen counties in Vermont.

Basically, defendant banks and the intervenor claim that this area is "economically, demographically and geographically" of insufficient size to constitute a section of the country within the intendment of Section 7 of the Clayton Act.

Defendant banks are two of four commercial banks operating in the geographic market selected by the Government. Vermont permits statewide branch banking for commercial banks,[3] and the defendants are the only two banks in the geographic market selected having their principal offices therein. The other banks in the area are branch offices of banks headquartered elsewhere in Vermont.

The Government alleges that Catamount is the second largest commercial bank doing business in the Bennington area, and that County National is the third largest commercial bank doing business in the area. The Government alleges that Catamount's total assets are 20.4 million dollars while those of County National are 17.1 million dollars. If their merger were consummated, the resulting bank's total assets of 37.5 million dollars would not be significantly lower than that of the proposed merger of the two banks in United States v. Phillipsburg National Bank and Trust Co., 399 U.S. 350, 90 S.Ct. 2035, 26 L.Ed.2d 658 (1970), in which the resulting bank's assets would have been 41.1 million dollars.[4] The population of the "Bennington area" was 23,733 in 1970.

■ The question raised[5] is well briefed by counsel for all parties. However, for a number of reasons, we question the advisability of deciding the case upon a motion for summary judgment. Summary judgment in antitrust actions should be used with great caution.[6]

■ Moreover, the criteria set forth by the Supreme Court and by other courts, as to what constitutes a section of the country within the intendment of Section 7 of the Clayton Act, lead us inescapably to the conclusion that the issue as to whether the market chosen is

3. 8 V.S.A. § 651 (1971). This section provides in substance that statewide branching is permissible when the Vermont Commissioner of Banking and Insurance issues a certificate finding
   that the establishment and maintenance of the proposed agency or branch will promote the general good of the state and provide beneficial services to the affected public * * *. [8 V.S.A. § 651(c)].
   These provisions, however, do not apply to any branch established before January 1, 1969. (8 V.S.A. § 651(d)).

4. 399 U.S. at 354, 90 S.Ct. 2035.

5. The identical question posed here was raised before the Supreme Court in *Phillipsburg, supra*. Intervenor, Comptroller of the Currency, argued that the Easton, Pennsylvania—Phillipsburg, New Jersey, area (total 1960 population, 50,465) could not as a matter of law constitute a section of the country within the intendment of Section 7 of the Clayton Act.

Brief for Appellee, Intervenor at 55–59, United States v. Phillipsburg National Bank, 399 U.S. 350, 90 S.Ct. 2035 (1970).

6. *See* White Motor Co. v. United States, 372 U.S. 253, 263–264, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963); Premier Electrical Construction Co. v. Miller-Davis, Co., 422 F.2d 1132, 1138 (7th Cir. 1970); Marine Space Enclosures, Inc. v. Federal Maritime Comm'n, 420 F.2d 577, 589 (D.C. Cir. 1969) ("Ordinarily, however, antitrust issues do not lend themselves to disposition solely on briefs and argument. Even though there may be no disputed 'adjudicatory' facts, the application of the law to the underlying facts involves the kind of judgment that benefits from ventilation at a formal hearing.") (citations omitted); Austin v. House of Vision, Inc., 385 F.2d 171, 172 (7th Cir. 1967); United States v. First National Bank of Sunbury, 311 F.Supp. 374, 378 (M.D.Pa. 1970). *See also* 6 Moore's Federal Practice ¶ 56.17 [5].

such a "section of the country" is largely one of fact.[7] The Senate Committee report on Section 7 seems to reinforce this conclusion. It states:

What constitutes a section will vary with the nature of the products. Owing to the difference in the size and character of markets, it would be meaningless, from an economic point of view, to attempt to apply for all products a uniform definition of section, whether such a definition were based upon miles, population, income, or any other unit of measurement. A section which would be economically significant for a heavy durable product such as large machine tools, might well be meaningless for a light product, such as milk. [Sen.Rep.No. 1775, 81st Cong., 2d Sess. 6.]

In Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), the Court noted that it is

clear that the "section" of the country to which the Act was to apply, referred not to a definite geographic area of the country, but rather the geographic area of effective competition in the relevant line of commerce. [370 U.S. at 320 n.35, 82 S.Ct. at 1521.]

And in *Phillipsburg, supra,* in reply to the argument that Phillipsburg-Easton could not conceivably be considered a market for antitrust purpose because it is not an "economically significant section of the country", the Court said: "we found 'relevant geographic markets' in cities 'with a population exceeding 10,000 and their environs.'" 399 U.S. at 365, 90 S.Ct. at 2044.[8]

The Court in *Phillipsburg* also stated that it was a commercial reality that banks have a very localized business and that in terms of relevant geographic market

[t]he proper question to be asked * * * is not where the parties to the merger do business or even where they compete, but where, within the area of competitive overlap, the effect of the merger on competition will be direct and immediate. * * * This depends upon "the geographic structure of supplier-customer relations." [399 U.S. at 362, 90 S.Ct. at 2042.]

In other words, the effective impact of the proposed merger must be stringently examined. The present state of the defendants' and intervenor's pleadings and affidavits on this motion set forth so few facts as to barely accommodate an educated guess, much less a critical detailed examination. The affidavits submitted by defendants and the intervenor pursuant to Rule 56(e) cite little more than the population figures of the area selected by the Government and the deposits of the four commercial banks doing business in the area. Certainly, upon the information at hand, it would be unwise to use these scant statistics to gauge adequately the effects upon competition in the area selected, or whether the geographic area selected should have been chosen in the first place. The Supreme Court in *Phillipsburg* scrutinized many factors to which we do not presently have access. For example, the Court considered the relationship of seven banks in the selected market in terms of assets, total deposits, demand deposits and loans. 399 U.S. at 354–355, 90 S.Ct. 2035. Notwithstanding the stringent examination by the Supreme Court in that case, *Phil-*

---

7. United States v. First National Bank of Maryland, 310 F.Supp. 157, 158 (D.Md. 1970). There the Court said:
   Congress and the Supreme Court, it is true, have established broad legal guidelines for the separation of permitted and proscribed bank mergers. But in most antitrust cases, it is the facts which govern the determination of whether or not there is a reasonable probability that the merger will cause a substantial lessening of competition in the foreseeable future in any section of the United States.
   *See* United States v. Crocker-Anglo National Bank, 277 F.Supp. 133, 138, 199 (N.D.Calif. 1967).

8. We attach no extraordinary significance, however, to this 10,000 population figure mentioned by the Supreme Court.

*lipsburg* has engendered in some quarters a plea for consideration of even more detailed market data, such as real estate loans, commercial and industrial loans and individual loans, in short "the most precise market data available". Survey Note, The Supreme Court, 1969 Term, 84 Harv.L.Rev. 30, 190 (1970).

For the reasons set forth in this opinion the Court finds that the pleadings, together with affidavits submitted, demonstrate genuine issues as to material facts. Accordingly, the defendants', intervenor's and Government's motions for summary judgment are hereby denied. See Rule 56(c) F.R.C.P.