Abraham N. Geller, J.
This is an action for breach of a sponsorship contract brought by plaintiff, herein referred to as “ABC”, against defendant insurance companies, collectively known as the Kemper Insurance Companies and herein referred to as ‘ ‘ Kemper. ’ ’
On August 15, 1962 the parties entered into a television network contract whereby Kemper agreed to sponsor one program per week of the ABC Evening Report news program over a 26-week period beginning October 17, 1962. On November 9, 1962, the fourth telecast under Kemper’s contract, a “promotional announcement” was made at the end of the sponsored program and just before the scheduled time was up, regarding the Howard K. Smith program on November 11 entitled “ The Political Obituary of Richard M. Nixon,” evidently occasioned by his recent defeat in the contest for the California governorship. Alger Hiss appeared on that program and attacked Richard M. Nixon. This caused considerable public controversy.
Protesting the appearance of Hiss on the ABC-TV Network and, in particular, the promotional announcement at the close of its sponsored Evening Report program and referring to the *399 numerous complaints received from its agents and policyholders, Kemper cancelled its participating sponsorship of Evening Report by telephone on November 13, 1962 and letter on November 14, 1962. ABC replied that same day that it intended to hold Kemper ‘1 fully responsible for any and all sums due and to become due to us under the terms of the agreement between us dated August 15, 1962.”
On November 14, about the time of the exchange of these letters delivered by hand, Mr. Herbert Brownell, of counsel for Kemper, discussed the matter with James C. Hagerty, vice-president of ABC News, and suggested that he call James S. Kemper, Chairman of the Board of Kemper, a personal friend for many years, to see if they could work out “ a reasonable solution of this whole problem.” Mr. Hagerty then suggested, and Mr. Brownell agreed, that it would be advisable to have Thomas W. Moore, then vice-president of ABC in charge of its television network and now president of the network, join him in talking with Mr. Kemper over the telephone.
The nature and effect of the subsequent conversation with Mr. Kemper and of the ensuing conversations and acts of the parties will be more fully developed in the consideration of Kemper’s second defense, interposed originally as a partial defense claiming that, as a result of these subsequent arrangements, Kemper was under no obligation for the seven programs from November 13, 1962 to December 31, 1962, and amended at the trial to assert it as a complete defense to ABC’s claim for the entire remaining 22 weeks of the contract.
In that November 14 telephone conversation Mr. Moore proposed what the parties have characterized as a “ hiatus ” during which there would be no Kemper commercials on Evening Report, with Kemper resuming its sponsorship thereafter. Mr. Kemper stated that he would submit the offer to his board for their consideration. Kemper claims that in a later talk on November 30, 1962 between Mr. Hagerty and Mr. Kemper, when Mr. Hagerty was inquiring as to what the board had decided and was informed that the board would not meet until shortly after the first of the year, there was an understanding and interpretation to the effect that Kemper was not to be obligated for the seven weeks of the “ hiatus ” period between November 13, 1962 and December 31, 1962. On January 4, 1963 Mr. Kemper advised Mr. Hagert^ in effect that the board had decided against “ coming back on the program.”
ABC sued on January 9, 1963. Its first cause of action was for the unpaid amount of $19,818.43 due pursuant to the contract for the November 9, 1962 broadcast. Its second cause of *400 action was for damages in the sum of $432,693.22 for Kemper’s cancellation and breach “on or about November 14, 1962 ” of the sponsorship agreement. Kemper interposed an answer containing six complete defenses, two partial defenses, and two counterclaims.
ABC’s motion to strike out the answer and for summary judgment was granted as to the first cause of action; all six complete defenses were stricken and the two counterclaims were dismissed as insufficient, the court noting with regard to the promotional announcement that it was in accordance with the custom of the industry; but held that there was a triable issue of fact as to whether the parties had made the alleged agreement asserted in the second partial defense as effectuating Kemper’s nonliability for programs broadcast in the period from November 13, 1962 to December 31, 1962; and that the first partial defense merely asserted a claim for mitigation of damages (American Broadcasting-Paramount Theatres, Inc. v. American Mfrs. Mut. Ins. Co., 42 Misc 2d 939, affd. 20 A D 2d 890).
The trial before this court thus dealt with the issue of the second partial defense and the question of ABC’s damages for breach of the sponsorship contract. The court granted Kemper’s trial motion to amend its pleading to assert that defense as a complete defense on the alleged ground that, by electing to sue exclusively on the basis of the original November 14, 1962 cancellation, which, according to Kemper, had been eliminated by the hiatus agreement, ABC had purportedly debarred itself from recovering even for the remaining 15 weeks of Kemper’s sponsorship period between January 1, 1963 and April 12,1963.
The court finds that no agreement of any kind was made during the so-called ‘ ‘ hiatus ’ ’ period but that there was merely an outstanding offer by ABC which was not accepted by Kemper. Furthermore, even assuming that there was a “hiatus agreement,” it would have been at best only an executory accord, not a substitute or superseding agreement, and ABC would have had the choice upon nonperformance thereof to sue either on the accord or on the original obligation.
There was not a word of writing between the parties regarding the “ hiatus.” The agreement of August 15, 1962, it should be noted, provided that it shall remain as their understanding and agreement ‘ ‘ until superseded or amended by some other written document or documents signed by both parties.”
In the telephone conversation of November 14, 1962 following Mr. Brownell’s talk with Mr. Hagerty, Mr. Kemper complained of the great pressure Kemper was under from its agents *401 and policyholders. Mr. Moore then suggested that Mr. Kemper reconsider his position regarding cancellation and permit the pressure to subside by taking a period of time during which there would be no Kemper commercials and then resume sponsorship. This proposal, although it would entail a substantial loss to ABC in view of the obvious difficulty in arranging for any sponsorship replacement in the brief time available during this off-season period, was made by ABC in an attempt to settle the dispute and avoid litigation.
Mr. Kemper testified that he replied: “If that’s what you are offering, a hiatus, to put the thing on ice for the time being, I will see that it is promptly considered by our board.” The “hiatus” has been referred to as a “cooling-off period” or ‘ ‘ gap ” or “ interruption ’ ’ in Kemper’s sponsorship to permit the situation to “ simmer down.”
It is clear from the testimony of Moore and Hagerty that, although it was not explicitly stated in that form, the resumption of sponsorship after the hiatus period was intended to be for the entire unfulfilled period of Kemper’s contract, i.e., 22 weeks, which, had ABC’s offer been accepted, would then have run from the expiration of the hiatus period to a new termination date extending for a like period of time beyond the contract expiration date of April 12,1963.
Kemper does not seriously dispute this view of the November 14 telephone conversation but contends that, in a subsequent meeting on November 30, 1962 between Mr. Kemper and Mr. Hagerty, the agreement set forth in Kemper’s second partial defense was reached. It is there alleged that, in consideration of Kemper’s undertaking to reconsider its decision not to sponsor any further programs, ABC agreed that Kemper would not be charged for the seven “Evening Report ” programs for the balance of 1962 and Kemper “ agreed to notify ABC shortly after January 1, 1963 whether Kemper would or would not sponsor the remaining 15 programs.”
The November 30 meeting, upon which Kemper relies, does not support its contention that an agreement was reached, no less the agreement claimed by it. Mr. Hagerty told Mr. Kemper that he had come merely to ask when the board was meeting on the hiatus question and, when other questions were raised, stated that he knew nothing about “legal fields ” and had no authority to talk about them. Mr. Kemper testified that during that meeting he said to Mr. Hagerty: “I assume that during this period our mutual obligations are waived or put on ice.” It is on the account of that meeting given by James S. Kemper, Jr., that Kemper bases its claim. But his testimony indicates *402 that there was no new or different understanding, merely an attempted clarification by his father of the November 14 telephone conversation. He testified: “My father said, ‘Well, first of all, about this hiatus that you fellows have proposed, is it definitely understood that under no circumstances are we to be responsible for sponsoring the program during the hiatus.’ ” Mr, Hagerty said: “That’s right.” Mr. Kemper continued: “ That was my understanding of the telephone conversation that I had with you and what’s his name the other day, and I wanted to make certain I understood this correctly.” Mr. Hagerty’s final words were: “You understand, if something can’t be worked out here, this will go over to the legal people and I will be out of the picture completely.”
It is obvious that Mr. Hagerty’s “ That’s right ” as to Kemper not being responsible during the hiatus period meant no more than that, since there were no Kemper commercials during the hiatus, it would not be held responsible while the offer was being held open. Not a single word suggestive of release or forgiveness of sponsorship obligation for 7 of the remaining 22 programs, or, indeed, of any programs was mentioned on this or any other occasion, nor was there anything said at any time that ABC’s offer was to have Kemper resume for “ 15 ” weeks only. The only discussion was as to whether Kemper would resume or go back on the program, which, of course, could only mean for the remaining unfulfilled period of the contract. There was no reason for ABC to give up the substantial sum represented by seven program sponsorships, well over $100,000, particularly since it had made the hiatus offer only after Kemper’s counsel had suggested a friendly call from Mr. Hagerty, and even that offer involved a considerable loss to it.
Kemper has the burden of establishing its claim that there was a release or forgiveness of its obligation for seven weekly programs. Unless there is explicit language showing such an understanding by the parties, it will not be implied from one ambiguous statement. A release of an obligation must be clearly and unequivocally expressed and understood as Something being given up by an obligee. It simply does not make sense that, by a play upon words but without a direct word on the subject, ABC can be deemed to have agreed to give up outright its claim for 7 out of 22 programs in exchange for Kemper’s mere promise to reconsider whether it would resume for 15 programs.
Actually, all during the hiatus period ABC’s offer remained outstanding. On January 3, 1963 the Kemper board rejected *403 ABC’s offer. No agreement of any kind had been reached after the cancellation to change Kemper’s obligations under its contract. The attempted accord never came into existence even as an executory accord, since ABC’s tender had not been accepted by Kemper (see Petterson v. Pattberg, 248 N. Y. 86, 88-89).
But, even if the board had accepted the offer, that would have been only an executory accord, defined as an agreement embodying a promise to accept at some future time a stipulated performance in satisfaction of a present claim or obligation and a corresponding promise to render such performance in satisfaction of such claim or obligation (General Obligations Law, § 15-501, subd. 1, derived from Personal Property Law, § 33-a, subd. 1). And, then, if Kemper had subsequently failed to perform the accord according to its terms, ABC would have had the choice of suing on the accord or the original obligation (General Obligations Law, § 15-501, subd. 3, derived from Personal Property Law, § 33-a, subd. 3).
Kemper endeavors to build up on the flimsy foundation of these exploratory talks a theory of a subsequent agreement on November 30 superseding the original contract obligation. It is true that, where the parties have clearly expressed or manifested their intention that a subsequent agreement supersede or substitute for an old agreement, the subsequent agreement extinguishes the old one and the remedy for any breach thereof is to sue on the superseding agreement (Blair & Co. v. Otto V., 5 A D 2d 276). But, if the intention of the parties, expressed by their conduct or words, is merely that the subsequent agreement provide for a future performance to be accepted as future satisfaction of an old obligation, such agreement is an executory accord, full performance of which alone extinguishes the old obligation. In the absence of a clear showing warranting a finding of superseder or substitution: “It is generally more reasonable to suppose that [a creditor] bound himself to surrender his old rights only when the new contract of accord was performed” (6 Williston, Contracts [Rev. ed.], § 1847). In Goldbard v. Empire State Mut. Ins. Co. (5 A D 2d 230) the court held that there was nothing in the series of informal conversations to suggest the finality, deliberateness or occasional formalization associated with substituted agreements and the specific intention to discharge pre-existing obligations.
This review of the facts and the law makes clear ABC’s right to sue on the basis of Kemper’s November 14, 1962 cancellation, its damages being computable for the remaining contract period from November 14, 1962 to April 12, 1963. It *404 merely withheld that suit until Kemper’s hoard refused its offer of an executory accord. The second partial defense, amended to be asserted as a complete defense, is accordingly dismissed on the merits.
'The contract provided that Kemper pay a fixed sum for ‘ ‘ program cost” and for ‘1 networking charge,” which for the 22 Kemper play dates amounts to $119,350, plus ‘ ‘ time charges ” for station lineups, a classified rate for each station and a formula being set forth to compute the time charges to be paid to ABC by Kemper. The stations listed include five owned and operated by ABC itself and over 100 independent but affiliated stations. ABC had an affiliation agreement with these independent stations, which contained a formula for computing the amount of station compensation payment to be made by ABC when such station was in the lineup telecasting a sponsored ABC program. ABC retained the difference between the time charges paid by Kemper and the station compensation payments made by ABC. The total time charges which would have been payable by Kemper on the basis of the lineup clearing “ Evening Report” on its 22 play dates amounted to $318,225.58. Thus the total contract price for these 22 play dates, had Kemper complied with the contract, would have Tocen $437,575.58. This figure is not substantially disputed.
“Evening Report” was a continuous program and ABC saved nothing in program costs or networking charges as the result of Kemper’s cancellation of its participating sponsorship. ABC also had the right to sue for the total time charges provided for in Kemper’s contract, even though it was required to pay a substantial portion thereof to the affiliated stations. Since Kemper’s payment of these total time charges was to be made to ABC in the first instance, it is not even necessary to invoke the authority of the provision in CPLR 1004, formerly section 210 of the Civil Practice Act, permitting a suit by or against a person “with whom or in whose name a contract has been made for the benefit of another” without joining the person for or against whose interest the action is brought.
However, when the court pointed out that Kemper would then be entitled to be credited with selloffs of any of Kemper’s 22 play dates not only by ABC but also by the affiliated stations through local sales (immediately upon cancellation, on November 15, 1962, ABC had released for local sales by affiliated stations the “ commercial positions formerly occupied by Kemper ” subject to recapture only if ABC obtained network sponsorship for any such dates), ABC withdrew that portion of its claim *405 represented by the station compensation payments which would have been payable to the affiliated stations had Kemper complied with the contract. ABC did not withdraw that part of its claim represented by the station compensation payable to its five owned and operated stations, properly crediting Kemper with local selloffs made by these five stations. Kemper’s objection to the inclusion in this group of station WXYZ, Detroit, on the ground that it is a separate corporate entity, is misplaced. Not only is it actually a division of plaintiff distinguishable only in its corporate setup from the other four owned and operated stations, but ABC always had the right to include in its suit amounts represented by station compensation, provided only that it gave credit for local selloffs by such station.
Kemper disputes ABC’s computation of the amount of the affiliated station compensation payments being withdrawn and deducted by ABC from its claim. It should be noted that, in the interest of facilitating the trial, the court directed ABC to permit inspection of all relevant records for the purpose of verification of its accounting procedures and computations by Kemper’s attorneys and accountants. ABC’s computation of the affiliated station compensation payments to be deducted is $135,864.33, Kemper’s $147,177.56. The court finds that Kemper’s method of computation fails to take into account the approximate 20 hours of free time per month granted to ABC by the affiliation agreement. The computation has to be made as if Kemper had complied with the contract, not as if Kemper were subsequently adding to the payments actually made. The free time must be allocated in equal proportions among all the sponsored programs of the month to determine the portion of the monthly payment allocable to each program. Kemper’s method would give it an advantage, even though it had broken the contract, merely because payment had already been made by all other sponsors who carried out their contracts. Deducting from the contract price of $437,575.58 the sum of $135,864.33, representing the withdrawn claim for the affiliated station compensation that would have been made for Kemper’s 22 play dates, leaves a net contract price claim of $301,711.25.
However, ABC claims that there should be added the sum of $23,572.73, which is the amount of station compensation payments it contends it is obligated to pay, by reason of Kemper’s cancellation, to the affiliated stations under a 28-day notice provision in the affiliation agreement. Strangely, enough, there is no provision referring to sponsorship cancellation as such, and the parties argue the applicability of two diverse *406 provisions. ABC relies on a provision requiring that it give at least 28 days’ advance notice of the “ discontinuance of any scheduled series of network commercial programs,” failing which it agrees to pay station compensation as if such series had continued for 28 days. Kemper claims the applicability here of a provision that ABC is not obligated to pay anything to an affiliate for the unsponsored portions of a program series agreed to be carried in its entirety by the station.
Although ABC maintains that it has been ABC’s “ policy” to pay affiliates under the 28-day notice provision where an affiliate requests such compensation for cancellation of a commercial sponsorship, it has not paid the only two affiliates who made such a request in this case. That provision by its terms is applicable only where a program series is discontinued. The reason for the provision apparently is that, without such advance notice, the affiliated stations would be involved in the problem and expense of hasty arrangements to provide a replacement program in addition to trying to get a sponsor. The provision does not apply where the series is continued by ABC despite the cancellation by one participating sponsor. The affiliates may then obtain compensation by means of local sales of the time made available by the cancellation without any program costs to themselves, as was here provided for by ABC’s notification to the affiliates on November 15, 1962. If the 28-day provision were held to be applicable in this situation, the affiliates would obtain station compensation from ABC as well as the proceeds of local sales for continuing ABC programs. The court holds that ABC is not obligated under this provision to its affiliates because of Kemper’s cancellation, and that portion of the claim is not allowed.
The final step in the computation of damages is to determine the amount to be credited or deducted from the net contract price claim — i.e., whether it should be the proceeds realized by ABC in the actual selloffs of some of the 55 commercial minutes of Kemper’s 22 cancelled play dates (as claimed by ABC) or the purportedly realizable value of all the 55 minutes (as claimed by Kemper). Kemper had 2% minutes of commercial time per program.
The general rule of damages applicable to a breach of contract for the sale of goods is contract price less market value, the loss to a seller being the difference between the price he was to receive and the value of the goods, less any expense he saves. While the law imposes upon the party injured by a breach of contract the active duty of making reasonable exertions to render the injury as light as possible, the burden of *407 proving that the damages sustained could have been prevented rests upon the party guilty of the breach (Hamilton v. McPherson, 28 N. Y. 72; Losei Realty Corp. v. City of New York, 254 N. Y. 41).
However, market value is not always the measure of recovery — as, for example, where there is no market for the type of goods involved, or where it is a contract for personal services, or where the subject matter of the contract is perishable. In such situations the damages are measured by the difference between contract price and cost of performance, on the principle that such sellers are entitled to the damages they have actually sustained by the breach of contract (5 Williston, Contracts [Rev. ed.], § 1379).
Advertising contracts have been held to fall into the latter category, so that upon wrongful withdrawal by an advertise]' the publisher is entitled to recover the contract price, reduced, as though the contract was one for services, by such amount as was or could have been obtained in the exercise of reasonable efforts to minimize damages by the use of that space for other advertisements (Ware Bros. Co. v. Cortland Cart & Carriage Co., 192 N. Y. 439). A sponsorship contract is a purchase of the privilege of identification as sponsor of a broadcast program for the purpose of advertising its products (Columbia Broadcasting System v. Amana Refrigeration, 295 F 2d 375). Its essential characteristic is that it is a form of advertising, and damages for a breach thereof should be governed by the rule applicable to advertising contracts generally. Moreover, the subject matter — commercial minutes or time — is perishable, since, if not sold in time, it has vanished and is of no value to anyone. Furthermore, there has been no showing that there is a market or market value for' commercial television minutes in the same sense as there is a market and market value for goods and commodities.
The rule, then, here applicable measures ABC’s damages on the basis of reasonable efforts to sell off Kemper’s available 55 minutes, reducing its net contract price claim by the proceeds realized from such sales as it could reasonably effect and not by the alleged market value of the entire 55 minutes. To keep the subject in perspective, it should be pointed out that the price in Kemper’s contract dated August 15, 1962 amounted to about $7,500 net per commercial minute (after deducting 15% agency commission) ■ that ABC’s sellofifs of 13% of the 55 minutes were at an average net price of $4,080 per minute; and that Kemper’s assumed market value, pursuant to a theory based on comparative audience ratings, is for the period here *408 involved $5,100 net per minute, not far removed from ABC’s selloffs.
The court determines that ABC made reasonable efforts, in light of the existent circumstances and consistent with its regular business practice, to sell off the available Kemper 55 minutes. On the day following the cancellation it notified all stations, including its five owned and operated stations, that they could proceed with local sales of such minutes, subject to ABC’s obtaining full network sponsorship for any of these minutes; and, by withdrawing the portion of the claim allocable to the affiliated stations and giving credit for local sales effected by its five owned and operated stations, it has given Kemper the benefit of all local sales. Within a few days after the cancellation it notified its sales staff to sell these 55 minutes at an offering price of Kemper’s $7,500 net per minute as a starting point for negotiations, which, could it have been realized, would have resulted in recoupment of Kemper’s contract price.
The period from November to April is off-season for the procurement of television sponsorship. The major contracts are negotiated months before the Fall season, which commences about the latter part of September. In fact, ABC was unable to consummate any direct sales of Kemper minutes but only as parts of “ package ” contracts, in which a sponsor purchases for a lump sum minutes in several different programs and, on occasions, is given a certain number of minutes on a no-charge basis or as a “ bonus.” In these package sales ABC sold 6% Kemper minutes at an average price per minute of $4,080; and 7 Kemper minutes at no charge, but these have likewise been credited to Kemper at the afore-mentioned average price of $4,080.
Consideration of the reasonableness of ABC’s efforts and realizations in the selloffs of Kemper’s cancelled 55 minutes, in light of the situation then prevailing, should include a comparative study of ABC’s sales during this period of other available “ Evening Report ” minutes. Prior to and on November 14, 1962 there were available 97 unsold “ Evening Report ” minutes. These were also offered by ABC at a starting price for negotiations of $7,500 net per minute. By April 12, 1963, 33 had been sold, all in “ package ” sales at an average price of about $4,200 net per minute. The sales price was about the same as for Kemper minutes and the percentage of Kemper minutes sold is within the range of the percentage of non-Kemper minutes sold.
Kemper takes a strained view of ABC’s selloff efforts. Its theory is that there is a precise mathematical relation between *409 audience rating figures given by statistical services and value per minute applicable to all sponsored programs. It claims that the drop in audience rating of “ Evening Report ” since the negotiation of Kemper’s contract brought the value of Kemper minutes down from $7,500 to $5,100 net per minute and contends, in effect, that ABC scared off possible purchasers by asldng for $7,500 rather than $5,100. However, its argument loses sight of the practicalities of the situation — that ABC felt duty-bound to recover, if possible, the contract price; that ABC dealt with Kemper’s minutes the same as it did with its other available “Evening Report ” minutes; that the offering price was merely a starting price; that the actual sales prices realized on those “Evening Report” minutes which ABC succeeded in selling after negotiations were lower, though not by much, than Kemper’s assumed value, proving that ABC did not turn down counteroffers because they were too low. The only reasonable conclusion is that there was no market as such at that time for sale of “Evening Report” minutes at higher prices. Certainly, ABC was interested in selling all the unsold “ Evening Report ” minutes, but the record establishes this could not be done in a manner consistent with its reasonable and regular business practice. ABC was not required, in the interest of minimizing Kemper’s damages, to disrupt its business by selling Kemper minutes at such low prices as to assure a complete selloff. As it is, it went as far as it deemed advisable in selling at about the same price all it could of its “Evening Report ” availabilities. Under the circumstances that price must be held to be a reasonable one; Kemper’s own witnesses conceded that the effect of a large number of other availabilities would be to depress their stated value of $5,100 net per Kemper minute and that, in addition, a discount would normally be requested and granted if sold as part of a “ package ” sale.
The selloffs by ABC, less the station compensation payments attributable thereto, and by its five owned and operated stations, realized $36,664.04. Thus, ABC’s recoverable damages are in the sum of $265,047.21.
As to interest, CPLR 5001 (subd. [b]) provides that it “ shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred.” It has been noted that the judgment entered on the first cause of action for the unpaid November 9,1962 telecast included interest from that date, November 9,1962. Here, in view of the so-called “hiatus” conversation on November 14, 1962, the earliest *410 “ ascertainable ” date the cause of action existed with respect to the seven play dates in 1962 was January 4, 1963. Interest is accordingly awarded on the sum of $84,333.20 from January 4, 1963 and on the respective sums of $12,047.60 for each of the 15 weekly play dates in 1963 from those respective play dates.