AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY, American Motorists Insurance Company, Federal Mutual Insurance Company and Lumbermens Mutual Casualty Company, Plaintiffs-Appellants,

v.

AMERICAN BROADCASTING–PARAMOUNT THEATRES, INC., Defendant-Appellee.

No. 133, Docket 31528.

United States Court of Appeals Second Circuit.

Argued Oct. 24, 1967.

Decided Dec. 15, 1967.

See also, D.C., 221 F.Supp. 848.

John W. Castles, 3d, New York City, (Lord, Day & Lord, Wendell Davis, Jr., New York City, of counsel), for plaintiffs-appellants.

Clarence Fried, New York City, (Hawkins, Delafield & Wood, Robert G. Desmond, New York City, of counsel), for defendant-appellee.

Before FRIENDLY, KAUFMAN and ANDERSON, Circuit Judges.

KAUFMAN, Circuit Judge:

Several insurance companies generally known as the Kemper Insurance Companies group [Kemper], the appellants here, instituted this action on May 23, 1963 against American Broadcasting-Paramount Theatres, Inc. [ABC] seeking a declaratory judgment that a television sponsoring agreement between Kemper and ABC constituted a tie-in which violated Section 1 of the Sherman Act, 15 U.S.C. § 1. The complaint, *inter alia*, sought treble damages in addition to a decree that the agreement was illegal and unenforceable. On May 31, 1967—almost 2 years after the parties had moved for summary judgment—the District Court granted ABC's motion and denied Kemper's. This appeal followed from the judgment against Kemper. We believe that summary judgment, as intended to be utilized pursuant to Rule 56 of the Federal Rules of Civil Procedure, was inappropriately and imprudently employed in this case to resolve the important and exceedingly complex factual and legal dispute presented to the trial judge. We are of the view that the antitrust questions cannot be resolved for there remain material issues of fact that are not brought into sharp focus or clarified by the record before us. We therefore reverse and remand for further proceedings consistent with this opinion.

## I.

A substantial portion of the District Court's careful and elaborate opinion (reported at 270 F.Supp. 619) is devoted to a detailed presentation of the factual background of the dispute. While we shall make an effort to avoid repetition, the complexities of the litigation will be sketched in order to clarify the reasons for our belief that summary judgment was inappropriate in this case.

ABC is one of 3 major television networks in the United States and during 1962–1963 approximately 260 television stations were affiliated with that network.[1] The greater part of network in-

1. For interesting discussions of the structure of the television industry and television advertising rate practices see Blake & Blum, Network Television Rate Practices: A Case Study in the Failure of Social Control of Price Discrimination, 74

come is derived from selling programs to sponsors (advertisers). All the networks arrange financial terms and details with their advertisers, such as providing network programs, technical facilities and scheduling programs for clearance. The programs and "commercials" are ultimately broadcast to the public over the facilities of local stations which are licensed by the Federal Communications Commission [F.C.C.].[2] The networks and local stations share the sponsor's payments on a percentage basis under the terms of an affiliation agreement.

In April 1961, ABC announced it would produce a nightly news program—the "Evening Report"—which it offered to its network stations on a 5-nights-per-week basis and by August, 95 stations had "cleared" (accepted) the program. These cleared stations are known in industry parlance as the "going lineup."

Under the typical affiliation agreement then employed by ABC, when a station cleared a program it was compelled to accept the sponsor provided by the network as well as those portions of the program for which the network could not find a sponsor. The local station did not receive any payment from ABC for broadcasting the unsponsored parts, but the apparent harshness of this arrangement was mitigated by the network's practice of "releasing" the unsold time to its affiliates for direct sale

by them.[3] Another facet of these complex arrangements was that the local stations were required to "option" certain time periods and to accept programs (and sponsors) provided by ABC for those hours. "Evening Report," however, was not broadcast during an option period and the local stations were therefore free to accept or reject the program as they saw fit.

From time to time, it was the practice of ABC to issue "offering sheets" concerning "Evening Report." In essence, these are notices advising potential advertisers of the number of clearing stations, the prospective cost of the program, the names of other advertisers, if any, already sponsoring the program, and other relevant details. The gross price mentioned in the offering sheets was in large measure dependent on the hourly station rates of the individual local stations which had cleared the program. ABC published these rates in a so-called "rate card" which was designed to reflect such factors as the number of homes with television sets reached by the particular station, the quality of its signal and the number of competing stations. In addition to the rate card time charge, the gross price contained in the offering sheet included a program charge and a "networking" charge. The offering sheet of April 27, 1961 is typical and its essential terms are set out in the margin.[4] We have been told that the offer-

Yale L.J. 1339 (1965) [Blake & Blum]; Note, Antitrust Implications of Network Television Quantity Advertising Discounts, 65 Colum.L.Rev. 1213 (1965) [Columbia Note].

2. Each of the networks, however, is owner and licensee of 5 local stations—the maximum permitted by FCC regulations. See Amendment of Multiple Ownership Rules, 18 Fed.Reg. 7796, 9 P. & F. R. R. 1563 (FCC 1953).

 Where the program is not a network program, the station is free to sell the broadcast time on that program directly to advertisers.

3. Such sales are known as sales on the "local market." The time released for local sales was, however, subject to recapture on 3 weeks' notice. In this

connection, it should be noted that ABC had two types of affiliation agreements —"primary" and "secondary"—which contained different terms. The vast majority of clearing stations were primary affiliates and the description in the text is of their relation with ABC. (For example, of the 95 stations that had cleared "Evening Report" in August 1961, approximately 90 per cent were primary affiliates which had their major network association with ABC.)

4. The program was offered for periods of 13 or 26 weeks for each week-day in one-quarter hour segments. The estimated lineup was 110 stations and the approximate gross was $34,500. This was based on rate card time charges for the clearing stations to which was added a program charge of $5,000, a 15 per cent commis-

ing sheet gross price was only a starting point for negotiations; a variety of "special discounts" were offered potential advertisers.[5] And, the ultimate price charged was the product of detailed negotiations between advertiser and network.[6] In fact, Kemper alleges and ABC does not deny that "Evening Report" was not sold by ABC to a single sponsor at full rate card.

The Kemper-ABC contract, dated August 15, 1962 (and resulting from extended negotiations), provided *inter alia,* that Kemper would sponsor "Evening Report" one evening per week for 26 weeks over 130 local television stations. But Kemper insists that it did not want to advertise over 32 of these stations and that it had agreed to take them only because ABC refused to make available the 95 stations it did want—except at an unreasonable cost—unless Kemper agreed to take the entire lineup.[7] According to Kemper, a detailed analysis convinced it that it did not do a sufficient amount of business in the markets served by the 32 stations to justify advertising over them. Moreover, it claims that it did not seek business from these areas because it could not adequately service customers located there. ABC admits that Kemper sought to eliminate the 32 stations but contends that the lineup question was of minor importance in Kemper's advertising policies. It also states that Kemper ultimately took the entire package offered by ABC because it best served Kemper's needs. On its surface, it would appear that the contract does not reflect an illegal tie-in; it merely recites an agreement to sponsor a program over 130 different stations. But, we are urged not to overlook that ABC's alleged

coercion is said to have taken place during the extensive period of negotiations which culminated in the contract.

Since the history of the negotiations is fully set forth in Judge Tenney's opinion, we will repeat only so much of it as will aid in comprehending our ultimate conclusion. It is not disputed that at a meeting in ABC's New York offices on January 25, 1962, Edgar Sherick, then ABC's vice president in charge of network sales, offered Buckingham W. Gunn, a senior official of Kemper's advertising agency, Clinton E. Frank, Inc. [Frank], the right to sponsor "Evening Report" at a package price of $22,000 per one quarter-hour segment for 2 segments per week over a 26 week period. The talks were preliminary, and detailed negotiations continued between officials of Kemper and the Frank agency and members of ABC's Chicago office. These talks culminated in a meeting that was held in the Chicago offices of the Frank agency on April 27, 1962—by which time the going lineup consisted of approximately 99 stations. The subject matter under considerable discussion was that Kemper would order 39 segments of "Evening Report" over a 26 week period but would have the right to reduce its order to one segment per week if within 30 days of signing the contract not all the stations in Kemper's key markets cleared the program. The price was to be $22,000 per segment for 39 segments and $24,000 if only 26 segments were ordered. In addition, Kemper expressed an interest in 28 stations which had not yet cleared the program. ABC was willing to agree to furnish 15 of these stations at a maximum charge of $3,000 (assum-

---

sion of $750, and a networking charge of $500. A "Special Discount" of 35 per cent off rate card was offered for the purchase of 2 quarter-hour segments over 26 weeks (or $28,675, including all charges) and a 30 per cent discount (or $30,400 *in toto*) was offered if 1 quarter-hour was taken.

5. For a detailed description of ABC's pricing practices see Blake & Blum, supra, 1351–53.

6. Id. at 1347. The legality of these practices under the principles of the Robinson-Patman Act, 15 U.S.C. § 13, has received much attention but is not now before us. See generally articles cited in note 1.

7. In the record, the precise number of unwanted stations is sometimes said to be 32 and at other times 35. Apparently 3 unwanted stations were added to the lineup after Kemper accepted ABC's terms.

ing all cleared) and the remaining 13 at "no charge."

On or about May 4, 1962 Kemper submitted its first "order letter" for "Evening Report" in which it asked for 39 segments over a 26 week period. The lineup requested consisted of 95 stations —67 of the 99 already cleared as well as the 28 requested at the April 27th meeting. For this package Kemper offered a total price of $24,250 which its order letter broke down into a time charge which was not to exceed $18,750, a program charge of $5,000 and a $500 networking charge. The time charges were to be reduced by the "package rate" of any of the ordered stations that did not clear the program. Kemper conditioned its order on all the stations in its 41 "key markets" clearing.

According to ABC, Kemper's May 4th order improperly substituted the 28 stations it had requested at the April 27th meeting for 32 of the stations that were part of the going lineup which ABC had offered. And, Kemper attempted to get these stations at the package rates discussed at the April 27th meeting even though the time charges for the 28 stations totaled more than twice those for the 32 stations. Accordingly, ABC rejected Kemper's order and on May 10, 1967 counter-offered Kemper the full 99 station lineup (which included the 67 stations ordered on May 4th) at a time charge of $15,750 and the 28 stations at a total cost of $3,000. With the program and network charges included, the cost was $24,250—the same as in Kemper's May 4th order. Although it was thus offered extra stations at no extra cost, Kemper maintains that it wanted and preferred the package as it ordered it on May 4th. It alleges that ABC consistently refused to sell it the lineup it sought except at full rate card—that is, without the 47½ per cent discount reflected in the April 27th discussions.

ABC admits that it refused to sell Kemper its limited lineup at the April 27th package rate although Kemper was asking for fewer stations at the same price; but, it responds (and Kemper denies) that it would be expensive to black out Kemper's commercials on the unwanted stations. Also, ABC tells us that it never insisted on Kemper paying full rate card for the smaller lineup but rather offered to negotiate further. In any event, Kemper ultimately accepted the entire lineup of 130 stations and a contract was signed.

## II.

The life of the Kemper-ABC agreement (dated August 15, 1962) proved to be less than the period consumed by the negotiations already discussed. After only 4 of the 26 ordered broadcasts, Kemper notified ABC that it considered its obligations under the contract at an end. It declared that on November 11, 1962, ABC had broadcast a program titled "The Political Obituary of Richard M. Nixon" during which Alger Hiss was permitted to evaluate Mr. Nixon's role in the Hiss perjury case. The program was promoted on broadcast time sponsored and paid for by Kemper and in substance it contended that ABC violated the contract by associating Kemper with a program that was in poor taste. Two days later Kemper advised ABC that it was cancelling its sponsorship. Efforts at reconciliation proved fruitless and on January 9, 1963 ABC filed suit in the New York Supreme Court for breach of contract. A final judgment was ultimately entered for $265,047.21. 48 Misc.2d 397, 265 N.Y.S.2d 76, aff'd, 24 App.Div.2d 851, 265 N.Y.S.2d 577 (1st Dept. 1965), aff'd, 17 N.Y.2d 849, 271 N.Y.S.2d 284, 218 N.E.2d 324 (1966). Kemper asserted for the first time its claim that the agreement with ABC violated the Sherman Act in its answer in the state court suit and in the complaint it filed in federal court.[8]

8. The state court chose not to adjudicate the validity of the contract under the antitrust laws although it indicated that on its face the contract was enforceable. 42 Misc.2d 939, 249 N.Y.S.2d 481 (1963), aff'd, 20 A.D.2d 890, 251 N.Y.S.2d 906 (1st Dept.1964), aff'd, 17 N.Y.2d 849, 218 N.E.2d 324, 271 N.Y.S.2d 284, cert. de-

On May 31, 1963, ABC moved in the federal court to dismiss Kemper's complaint on the ground that it failed to state a claim upon which relief could be granted. Judge Cooper denied this motion, 221 F.Supp. 848 (S.D.N.Y.1963), noted, 39 Notre Dame Law. 719 (1964), holding that the allegation that ABC refused to make available a limited line-up of 95 stations except at a disproportionately high price stated a cause of action under the Sherman Act. The case was then assigned to Judge Tenney as a Rule 2 Judge (Rule 2, General Rules for the Southern and Eastern Districts of New York) and the motions for summary judgment were then argued to him. After examining voluminous affidavits, exhibits and depositions, he granted ABC's motion for summary judgment in a painstaking opinion which consumes almost 70 pages in the appendix on this appeal.

Judge Tenney advanced 4 grounds for his decision. First, he ruled that ABC sold Kemper a single "product"—the privilege of being identified as the sponsor of "Evening Report." Since only a single product had been sold, a tie-in could not have occurred. Second, assuming *arguendo* that the transaction was properly characterized as the sale of different television stations, for purposes of tie-in analysis the different stations were components of a single product because it was "a reasonable and economically justified requirement of the industry" to sell them all as one package. Third, assuming *arguendo* that more than one product was involved in the sale, ABC was legally justified in rejecting Kemper's May 4th order and reverting to its higher rate card prices "even though said prices are substantially higher than the average price per unit for all the components of the package." Finally, he ruled that Kemper was not coerced by ABC because it never attempted to negotiate a lower price after ABC rejected its May 4th order. Al-

though we understand the reasons which would motivate a district judge in seeking to avoid a complex and grating trial, we believe that material questions of fact were presented with respect to each of these alternative grounds for decision and that summary judgment was improper.

## III.

The importance of summary judgment in the structure of modern federal practice as a procedural weapon to pierce sham claims and resolve actions where the facts are undisputed has been frequently noted by this court. See, e. g., Dressler v. MV Sandpiper, 331 F.2d 130 (2d Cir. 1964). Although some of the older decisions of this court had put in question the wisdom of granting summary judgment, we interpreted the 1963 amendments to Rule 56 as suggesting that the courts thereafter were to approach the Rule with less reticence and more resoluteness. Dressler v. MV Sandpiper, supra (discussing cases); 6 Moore's Federal Practice ¶ 56.15 [1], 1966 supp. at 102.

The functions and purposes of summary judgment have been stated thus:

"It is intended to prevent vexation and delay, improve the machinery of justice, promote the expeditious disposition of cases, and avoid unnecessary trials where no genuine issues of fact are raised. The procedure enables a party to pierce the allegations of fact in the pleadings and obtain relief by showing that there are no issues to be tried. Its purpose is to separate the formal from the substantial issues, eliminate improper issues, determine what, if any, issues of fact are present for the jury to determine, and enable the court to give judgment on the issues of law where no disputed issues of fact are found." 3 Barron & Holtzoff, Federal Practice and Procedure,

nied, 385 U.S. 931, 87 S.Ct. 291, 17 L. Ed.2d 213 (1966). ABC does not contend that the state court judgment bars

Kemper from pressing the instant litigation.

§ 1231, at 97–100 (Wright ed. 1958) (footnotes omitted).

But it is a fundamental maxim that on a motion for summary judgment the court cannot try issues of fact; it can only determine whether there are issues to be tried. And, "[o]n summary judgment the inferences to be drawn from the underlying facts contained in such materials [affidavits, exhibits and depositions] must be viewed in the light most favorable to the party opposing the motion." United States v. Diebold, 369 U. S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam).[9] Thus, the standard to be applied on a motion for summary judgment is analogous to that used on a motion for a directed verdict. Empire Electronics Co. v. United States, 311 F.2d 175, 180 (2d Cir. 1962). See 6 Moore, supra, ¶ 56.02 [10]; 3 Barron & Holtzoff, supra, § 1234, at 133. Of course, the law provides no magical talisman or compass that will serve as an unerring guide to determine when a material issue of fact is presented. As is so often true in the law, this is a matter of informed and properly reasoned judgment.

■ The instant litigation is somewhat atypical because both parties clamor for summary judgment urging that the record presents no disputed material issue of fact—as if a trial is to be avoided like the plague. But, rather typical of such "agreements" to end the case by summary judgment, this admirable harmony does not carry over to agreement on what the "undisputed" facts are or the permissible inferences to be drawn from them. While a substantial part (but not all) of the evidence is documentary, the parties sharply dispute the inferences to be drawn, see United States v. Diebold, Empire Electronics v. United States, supra, and, as

we shall see below, the depositions present conflicting testimony. In any event, "[t]he well settled rule is that cross-motions for summary judgment do not warrant the court in granting summary judgment unless one of the moving parties is entitled to judgment as a matter of law upon facts that are not genuinely disputed." 6 Moore, supra, ¶ 56.13, at 2247. See also Barron & Holtzoff, supra, § 1239, at 176. Nor, have we lost sight of the fact that neither ABC nor Kemper requested a jury trial and that ultimately the unresolved questions will be decided by the District Judge. But the function of an appellate court is not to determine whether there is sufficient evidence in the record to substantiate "findings" of fact that were never made. Compare Bollenbach v. United States, 326 U.S. 607, 614, 66 S.Ct. 402, 90 L.Ed. 350 (1946). On the contrary, the District Court must at a trial resolve contested factual issues and draw the appropriate inferences in the first instance with full recognition that the issues are disputed, and only after sufficient evidence has been introduced to permit an informed judgment. As we said in Empire Electronics Co. v. United States, supra, 311 F.2d at 180–181: "If reasonable inferences could be drawn * * * such that the issue would be submitted to the trier of fact, then Rule 56(c) leaves us no latitude and *we must return that issue to the trier of fact in this case the judge.*" (Emphasis supplied.) See 6 Moore, supra, ¶ 56.15 [1–02], at 2291–92; Asbill & Snell, "Summary Judgment Under the Federal Rules—When an Issue of Fact is Presented," 51 Mich.L.Rev. 1143, 1146 n. 15 (1953). Cf. Colby v. Klune, 178 F.2d 872, 874 (2d Cir. 1949).

■ Moreover, we have been forewarned that the use of summary judgment in complex antitrust litigation must be closely scrutinized. Poller v. Colum-

---

**9.** In light of the history of the Kemper-ABC agreement one may suspect that the claim of Sherman Act illegality was an afterthought to justify having broken a contract that had turned sour. And, it is understandable that the District Court looked with a jaundiced eye on Kemper's allegations that it was coerced into accepting all 130 stations. But, "[t]hat it might be surmised that the adverse party is unlikely to prevail at the trial is not sufficient to authorize summary judgment against him." 3 Barron & Holtzoff, supra, § 1234, at 132.

bia Broadcasting System, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). And, this admonition is apt where too little is known of the practical impact of the challenged transactions, White Motor Co. v. United States, 372 U.S. 253, 263–264, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963). But, this is not to say that summary judgment never has a place in the antitrust field. See White Motor Co. v. United States, supra, 372 U.S. at 259, 83 S.Ct. 696; 6 Moore, supra, ¶ 56.17 [5]; 3 Barron & Holtzoff, supra, § 1232 (1967 supp.).

 The question before us is not the availability of the rule in any specific category of cases, but whether the record in this particular case adequately clarifies the complex and convoluted issues that are so common in antitrust litigation. Thus, our holding here does not weaken the force of Rule 56, but "simply recognize[s] that there are instances where summary judgment is too blunt a weapon with which to win the day, particularly where so many complicated issues of fact must be resolved in order to deal adequately with difficult questions of law which remain in the case." Miller v. General Outdoor Advertising Co., 337 F.2d 944, 948 (2d Cir. 1964). Cf. Allied Mutual Insurance Co. v. Lysne, 324 F.2d 290 (8th Cir. 1963); S. J. Groves & Sons Co. v. Ohio Turnpike Commission, 315 F.2d 235 (6th Cir. 1963). In the context of this case, Judge Weinfeld stated the precept well:

"I am persuaded that a decision after trial will be the more desirable procedure in the matter. It will serve to bring into sharper focus certain issues of importance which have been obscured by the voluminous affidavits with their statements, counterstatements and alternative positions, and the conflicting conclusions which the parties contend are to be drawn from the multitude of facts and statistics presented.

Under all the circumstances the application of the summary judgment rule is questionable and the Court deems it sound judicial administration to permit a trial for such additional evidence and clarification as may be relevant." United States v. Bethlehem Steel Corp., 157 F.Supp. 877, 879 (S.D.N.Y.1958) (Bethlehem was ultimately tried to the court, 168 F.Supp. 576).

See also Kennedy v. Silas Mason Co., 334 U.S. 249, 256–257, 68 S.Ct. 1031, 92 L.Ed. 1347 (1948); H. J. Heinz Co. v. Beech-Nut Life Savers, Inc., 181 F.Supp. 452 (S.D.N.Y.1960).

## IV.

With these principles in mind, we turn to the grounds for decision advanced by the District Court. Judge Tenney reasoned that ABC had not tied the sale of the 95 stations Kemper wanted to the sale of 32 stations it did not want because, conceptually, only a single "product" was involved in the transaction. Indeed, it is axiomatic that a tie-in analysis begins with the question of separability—the requirement that the tying and tied products be different, or, stated simply, that the forced purchase be of a second distinct commodity. As Professor Turner (now Assistant Attorney General in charge of the Anti-Trust Division) stated:

"The requirement that they [the tying and tied products] be 'different' obviously cannot be dropped out. Every manufactured item is a combination of various materials and components. There are obvious cases in which we would say either that there is no tie-in because the object of the sale is a single product, or that if there is a tie-in, it should not be deemed illegal per se or even illegal at all." Turner, The Validity of Tying Arrangements Under the Antitrust Laws, 72 Harv.L. Rev. 50, 67–68 (1958).

See Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 614, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); Susser v. Carvel Corp., 332 F.2d 505, 512 (2d Cir. 1964), cert. dismissed, 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965); Pearson, Tying Arrangements and Anti-trust Policy, 60 Nw.U.L.Rev. 626, 627 (1965).

*Times-Picayune,* supra, has been cited to us as a case where the Court was presented with a question for determination not too dissimilar from the one before us. The government contended that the defendant had unlawfully tied the sale of advertisements in its morning newspaper to the sale of advertisements in an afternoon paper it also published. The Court stated that:

> "two newspapers under single ownership at the same place, time, and terms sell indistinguishable products to advertisers; no dominant 'tying' product exists (in fact, since space in neither the Times-Picayune nor the States [the two papers] can be bought alone, one may be viewed as 'tying' as the other); no leverage in one market excludes sellers in the second, because for present purposes the products are identical and the market the same."
> 345 U.S. at 614, 73 S.Ct. at 883.

But the issue of separability here is not quite the same as in *Times-Picayune;* it is manifest that whether one or more products is involved in a given transaction must be dependent upon the nature of that transaction. One factor that may distinguish this case from *Times-Picayune,* for example, is that commercials over different local television stations reach what are clearly different markets.[10] Moreover, as Judge Tenney recognized, the influence of the Court's analysis of the tying issue in *Times-Picayune* has been relatively restricted in later cases. See, e. g., Associated Press v. Taft-Ingalls Corp., 340 F.2d 753, 760–761 (6th Cir.), cert. denied, 382 U. S. 820, 86 S.Ct. 47, 15 L.Ed.2d 66 (1965).

The District Judge, in determining that a single product was involved in the Kemper-ABC transaction, placed major reliance on Columbia Broadcasting System, Inc. v. Amana Refrigeration, Inc., 295 F.2d 375 (7th Cir. 1961) cert. denied, 369 U.S. 812, 82 S.Ct. 689, 7 L.Ed.2d 612 (1962).[11] In *Amana,* CBS sued to recover monies due under a television sponsorship agreement and Amana counterclaimed that CBS's rate structure violated sections of the Clayton Act, 15 U. S.C. §§ 13(a), 14 and 15. The court held that "a purchase by Amana of the privilege of having itself identified as sponsor of the program broadcast and making use of the permissible portion thereof for advertising its products" was not the purchase of a "commodity" within the meaning of the Act. Id. at 378.[12] Whether or not *Amana* correctly characterizes the nature of the sale in this case, a point we do not decide, we see nothing in the rationale of that opinion which compels a holding that in analyzing the tying issue "the privilege of having itself identified as sponsor of the program" should not or may not be considered a different "product" for each station sold. We have already noted that each local station is licensed independently by the F.C.C. and serves different markets. To absolutely preclude applicability of the Sherman Act—a broad remedial statute—merely by characterizing a transaction by some *ipse dixit* formulation would be to frustrate the Congressional intent in a most mechanical fashion. In any event, this is merely to recognize the problem, not to solve it; there may yet be ample justification for

10. Compare Blake & Blum, supra, at 1385–86: "Characterizing the network's discount practices as tying arrangements does not present the difficulties encountered by the Court in *Times-Picayune.* Even assuming the Court there had sound bases for treating readership of the morning and evening papers as homogeneous, which seems doubtful, network tie-ins are of much more distinct products. Evening and afternoon viewers of television, for example, constitute a substantially different market, as do viewers in New York and Dubuque. Furthermore, the morning and evening papers effected critical economies by leaving ad materials intact in page layouts from morning to evening editions. Network time tie-ins have no comparable claim to achieving economic efficiency."

11. *Amana* has not received a welcome reception from the commentators. See, e.g., Blake & Blum, supra at 1379–80; Columbia Note, supra at 1232–34.

12. The Sherman Act, of course, is not limited to "commodities."

treating a sale of advertising time over different stations as a single "product" for purposes of the antitrust laws. Compare Dehydrating Process Co. v. A. O. Smith Corp., 292 F.2d 653, 655 (1st Cir.), cert. denied, 368 U.S. 931, 82 S.Ct. 368, 7 L.Ed.2d 194 (1961).

Recognizing these considerations, Judge Tenney held that it "is a reasonable and economically justified requirement of the industry" to sell many-station lineups as a single package.[13] The trial judge applied the four criteria of separability laid down in United States v. Jerrold Electronics Corp., 187 F.Supp. 545, 559 (E.D.Pa.1960), aff'd per curiam, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961), and for present purposes we accept his summary of Jerrold. The first test is: "Did competitors of the seller offer all the components of the alleged 'product' separately and not exclusively as a single package?" Kemper alleges, and ABC does not deny, that when it advertised over the NBC network it was allowed to select its own lineup. And, there is some indication in the record that this practice was not uncommon in the industry. The second test is: "Was the number of components of the product variable 'so that hardly any two versions of the alleged product were the same?'" It is not disputed that ABC offered a going lineup to all prospective purchasers. But an uncontroverted affidavit submitted by Kemper alleges that on a number of occasions ABC sold "Evening Report" on a selective partial lineup basis.[14] Moreover, ABC admits that it was willing to sell Kemper the lineup it desired; ABC merely demanded that Kemper pay more. Third, "Was the purchaser charged for each component and not a lump sum for the total product?" It is undisputed that ABC's offering sheets set a total price per broadcast but it is also true that ABC published a rate card time charge for each individual station. Finally, "Did the seller offer similar components for sale separately?" As noted above, there was evidence suggesting that ABC did this on occasion.

Thus, applying the criteria suggested by Jerrold to the case before us, and drawing all inferences in favor of Kemper as we are required to do, United States v. Diebold, supra, we are unable to determine on the record before us whether the Kemper-ABC transaction concerned a single product for purposes of a tie-in analysis.[15] The evidence submitted on this motion for summary judgment was simply insufficient to make a determination that the practices just described were typical or economically necessary in the television industry. ABC urges that it is in the public interest for it to build a "strong network." But it is not at all clear from the facts what added burden would have been imposed upon ABC had Kemper sponsored the program over only some of the stations which had

---

13. A number of commentators have argued that the sales of commercial time over different television stations constitute different products for purpose of tie-in analysis. See, e.g., Schwartz, Antitrust and the FCC: The Problem of Network Dominance, 107 U.Pa.L.Rev. 753, 779–80 (1959). ABC seeks to explain away such authorities by pointing out that they deal with "must buy" practices by the networks and it asserts it does not have a "must buy policy." That may well be true but it misses the point. An analysis that "must buy" constitutes an illegal tie-in necessarily presupposes that the sale of time over different stations constitutes more than one product.

14. For example, Kemper claims that in May 1963 General Mills purchased 69 stations from a master lineup of 106 stations; that in February 1964 Armour & Co. bought 37 stations out of a lineup of 109 and Sun Oil bought 44 of 104 stations.

15. We note in this connection that the actual holding of Jerrold was that the defendant was justified in treating the "components" it sold as one "product" only for a short period following its introduction as a new "product," 187 F. Supp. 559–561. And, we have stated that "tying arrangements have been given short shrift under the antitrust laws." Susser v. Carvel Corp., supra, 332 F.2d at 512.

cleared it for broadcast.[16] For example, would the network or local stations have incurred substantial costs by blacking out the undesired stations? Was there a ready national market where ABC could have sold the remaining stations? Would local stations refuse to clear the program if they knew that they might not be sponsored by particular advertisers? On the record presented, we find it impossible to answer these and similar relevant questions. In order that our decision not be misconstrued, it should be emphasized that we do not now hold that more than one "product" is involved in the sale of commercial time over many stations; we merely hold that additional evidence and clarification is required.[17]

## V.

Finally, the District Court decided that Kemper failed to demonstrate that ABC had employed an illegal tie-in (assuming, *arguendo,* that more than one "product" was involved) because "the necessary element of coercion, economic or otherwise, has not been proven." See Osborn v. Sinclair Refining Co., 286 F. 2d 832, 836 (4th Cir. 1960), cert. denied, 366 U.S. 963, 81 S.Ct. 1924, 6 L.Ed.2d 1255 (1961). Two independent reasons were given: (a) ABC was legally justified in rejecting Kemper's May 4th letter order and reverting to its rate card time charges for Kemper's selected lineup; and (b) Kemper never attempted to negotiate a discount price after ABC rejected its May 4th order. This argument, we assume, is based on the premise that if Kemper never attempted to open the door, it cannot claim it was slammed in its face.

▮ Here too, we find it impossible on the record before us to determine whether ABC was justified in reverting to its higher rate card prices. As we

view the law, where there is no quality or distinguishing desideratum between a product offered singly or in a package, the seller cannot charge substantially higher for the individual product if the price differential has the effect of conditioning the sale of the single product to the sale of the entire package and if the difference in price cannot be legitimately justified by cost considerations.

The leading case in this area is United States v. Loew's Inc., 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962), in which the government challenged the "block booking" of feature motion picture films for sale to television exhibitors. The lower court decree had enjoined the defendants from:

"(C) Entering into any agreement to sell or license the right to exhibit any feature film over any television station in which the differential between the price or fee for such feature film when sold or licensed alone and the price or fee for the same film when sold or licensed with one or more other film [*sic*] has the effect of conditioning the sale or license of such film upon the sale or license of one or more other films." Id. at 43, 83 S.Ct. at 101.

The government contended that this provision was too vague for effective enforcement and the court responded:

"The final judgments as entered only prohibit a price differential between a film offered individually and as part of a package which 'has the effect of conditioning the sale or license of such film upon the sale or license of one or more other films.' * * * Differentials unjustified by cost savings may already be prohibited under the decree as it now appears. Nevertheless, the addition of a specific provision to prevent such differentials will prevent uncertainty in the operation

---

16. Neither party has cited, and we have not found, any recent study of the FCC dealing with these problems. And generally, the FCC appears not to have been overly concerned with antitrust considerations. See Schwartz, Antitrust and the FCC: The Problem of Network Dominance, supra note 13, 781–86.

17. Similarly, we voice no opinion on the rule of law that would apply if a sponsor demanded a lineup of two or three stations. See Pearson, Tying Arrangements and Antitrust Policy, supra at 628–29, commenting on Judge Cooper's opinion below. We will cross that bridge when we come to it.

of the decree \* \* \* to ensure that all proper bases of quantity discount may be used, the modification [of the decree] should be worded in terms of allowing all legitimate cost justifications." Id. at 54–55, 83 S.Ct. at 107.

We do not read this to mean, of course, that a purchaser can select the most expensive individual item from a package and demand it at the average price for all the items in the package— a price which necessarily reflects the charges for the less costly components of the package. But Kemper was not selecting a limited number of stations and demanding them at the average package price; it insists it was willing to pay for its limited 95 station lineup what ABC was demanding for all 130 stations. The trial judge seemed more certain than we are that in its May 4th order Kemper substituted the 28 more expensive for the 32 cheaper stations.[18] In any event, regardless of how Kemper arrived at the figures it used in its May 4th order, we are still faced with Kemper's claim that it was requesting fewer stations than ABC was offering at the price ABC was demanding. And, under the circumstances of this case, we do not think it is an answer to say that the rate card prices to which ABC reverted were pre-established. Apparently, full rate card prices were never charged by ABC. Moreover, to hold that a seller can avoid the impact of the *Loew's* rationale merely by setting a pre-established price for each individual item—even if that price is rarely if ever charged and is, in relation to the package price, fanciful and unjustified by cost—would mean that the antitrust laws could be flouted at will.

On the incomplete record before us, we find it impossible to determine whether there were justified cost differentials between ABC's individual and package prices. The extent of the extra administrative burden, if any, that ABC would incur if it had to negotiate on a less than full lineup basis is unclear. And, Kemper maintains steadfastly that ABC would incur no cost by having to black out the unwanted stations. While there are suggestions in the record that would seem to lend some support to this contention, it is possible that although blacking out involves no cost to the *network*, it would impose a substantial burden on the individual stations—a burden which might ultimately have to be borne by the network. In any event, additional evidence is needed before a determination can be made that ABC's pricing differentials were justified by costs.

As we have already noted, the District Judge found that Kemper never attempted to negotiate with ABC after it rejected its May 4th letter order. Judge Tenney seems to suggest that Kemper

---

18. As we understand the parties' contentions, there are two different equations submitted for arriving at the figures in Kemper's May 4th order. Kemper claims it was willing to pay for 67 of 99 stations the $15,750 ABC was asking for the full lineup of 99. It asserts that it added to this figure the $3,000 charge for the 28 additional stations it wanted, to arrive at the $18,750 station time charge found in its May 4th order. ABC claims that Kemper treated all 99 stations as fungible and deducted a proportional amount ($2,871.23) for the 32 unwanted stations from the time charge used at the April 27th meeting. It then added $5,588.88—the discounted rate for the 28 stations it wanted—to arrive at a figure of $18,467.65, which was rounded to $18,750 in the May 4th letter.

It is apparent that either theory would account for the figure Kemper used.

While it is relatively clear that Kemper, in an intra-office memo sometime previous to the April 27th meeting, employed the method of computation suggested by ABC, an official of the Frank agency swore in an affidavit submitted on the motion that these earlier computations were not reflected in Kemper's orders. We have already indicated in part II that on a motion for summary judgment, with no opportunity to evaluate the demeanor of the witnesses, it is not the function of the court to determine whether the affiant is telling the truth or that he seems "persuasive." We note in this connection that it is not obvious to us why Kemper should have used a figure of $5,588.88 for the 28 extra stations when ABC had previously stated at the April 27th meeting that it would agree to charge only $3,000.

had a duty to approach the hierarchy of officialdom at ABC's New York office with respect to a discount on its selected lineup, and should not have been content to accept the rejection it received from the lower echelon in the network's Chicago sales office. But the law does not demand that Kemper joust with windmills; it would have been reasonable to require it to negotiate only if there was a chance of success. If all the inferences are resolved in favor of Kemper—as we are required to do on ABC's motion for summary judgment, United States v. Diebold, supra—we believe that on the record before us it is a disputed issue of fact whether, under all the circumstances of this case, it was reasonable to have required Kemper to attempt to negotiate further after ABC rejected its order.

Kemper has insisted in these summary proceedings that ABC adamantly refused to sell the desired lineup at other than rate card. And, an ABC official asserted that he had been told by his superior that "if they [Kemper] insist on a specific lineup, they must pay rate card." Of course, if this ABC policy was never communicated to Kemper, it could not have been a factor in the decision not to negotiate; but, this is not clear. It is also true that there was some evidence that at a meeting held on May 18th, Kemper was told that "we [ABC] would be willing to renegotiate the deal." However, the record also discloses that at another point in the meeting Kemper was told that the selected lineup would cost "rate card and then some." Moreover, an official of the Frank agency stated that after the May 18th meeting he was informed that "ABC New York" wanted Kemper to take the full lineup and the price seemingly was to be rate card. Following all these meetings and conversations, Kemper alleges that it concluded that any further efforts to get ABC to modify its position would be doomed to failure. Consequently, it capitulated and agreed to ABC's terms.[19] It is apparent to us that the facts underlying the negotiations are in serious conflict and thus it is impossible to resolve them on this motion or to draw inferences adverse to Kemper, as would be necessary for a holding that Kemper's refusal to negotiate was unreasonable.[20]

## VI.

In sum, we are of the opinion that this case was not ripe for summary judgment. While this matter has already been pending for an inordinate amount of time, we cannot grant or withhold summary judgment merely because it would save time or expense. Cf. 3 Barron & Holtzoff, supra, § 1231 (1967 supp.). We suggest in the interest of judicial economy, however, that the District Court first determine at trial whether it was reasonable for Kemper not to have attempted to negotiate further. A negative answer based

---

**19.** The District Court placed great emphasis on a number of Kemper memoranda that did not indicate the lineup problem was of importance to the company. The significance of many of these documents without further evidence must be discounted, however, since they were written after Kemper alleges it capitulated to ABC's demands.

**20.** We frankly find the positions advanced by both parties in this summary proceeding somewhat puzzling and incongruous. Kemper claims it refused extra stations although they would cost nothing additional because it could not adequately service potential customers. ABC, on the other hand, apparently insisted that Kemper take something for nothing, allegedly because it would be expensive to cut out the unwanted stations. But when Kemper ordered its limited lineup, ABC did not respond "you can have your lineup at the package rate but you will, of course, have to pay any expenses we will incur by cutting out stations." Instead, it spoke of "rate card and then some"— to an important customer—although it apparently never charged anyone rate card. The only fact of possible monetary significance that we can detect between Kemper's offer and ABC's counteroffer is that Kemper stipulated that the charge "shall be reduced by the package rate of any station not clearing." But the maximum price effect appears to be relatively insignificant and it does not rationalize for us the positions of the parties.

on adequate evidence and findings would obviate the need for further proceedings with respect to the issues discussed in part IV of this opinion.[21]

Summary judgment in favor of ABC is reversed.

21. Another issue, not raised by ABC, which could well be explored before confronting the important and difficult problem of application of the "tie-in" principle to network broadcasting, is the possible bearing of Kelly v. Kosuga, 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959). The principal, indeed almost the sole, item of damage which plaintiffs seek to recover is the state court judgment for their breach of contract committed for a reason wholly unrelated to the antitrust laws; if, under Kelly, the antitrust laws did not give Kemper a valid antitrust defense to that suit, they can hardly permit it to recover three times the amount of the judgment. The case arguably differs from Kelly in that here the contract included the sale of something alleged to constitute an illegal tie-in; however, it is also unlike Associated Press v. Taft-Ingalls Corp., 341 F.2d 753 (6th Cir.), cert. denied, 382 U.S. 820, 86 S.Ct. 47, 15 L.Ed.2d 66 (1965) in that, although the record is not completely clear on this point, the price for the entire package of 130 stations appears to have been no greater than Kemper was willing to pay for the 95 stations they wanted. We note also that the discussion in Kelly assumed that there was a "lawful sale for a fair consideration," 358 U.S. at 521, 79 S.Ct. at 432 (emphasis supplied), a fact upon which the District Court made no findings.